## HOUSTON CHRONICLE PUB. CO. v. QUINN. (No. 66.)*

(Court of Civil Appeals of Texas. Beaumont. Feb. 10, 1916. Rehearing Denied March 16, 1916.)

1. APPEAL AND ERROR ⬅882(8)—REVIEW—ESTOPPEL TO ALLEGE ERROR.

In an action for libel, defendant cannot complain of error in permitting plaintiff to testify that he was shot through his lung and shoulder and confined in the hospital, where defendant introduced in evidence a newspaper published by it stating substantially the same facts.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3597, 3598; Dec. Dig. ⬅ 882(8).]

2. LIBEL AND SLANDER ⬅100(6)—ACTIONS—EVIDENCE—ADMISSIBILITY.

In an action for libel, where the petition alleged that prior to the publication of the libelous article plaintiff had always enjoyed the reputation of a peaceable and law-abiding and worthy citizen, and the answer denied sufficient information on which to base a belief, testimony as to the good reputation of plaintiff was admissible.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 256; Dec. Dig. ⬅ 100(6).]

3. TRIAL ⬅296(1)—INSTRUCTIONS—CURE BY OTHER INSTRUCTIONS.

In an action for publication of a libelous charge that plaintiff had murdered another, where it was stipulated that the charge was false except as to the fact of the killing, and that plaintiff's act was in self-defense, a charge that the article complained of was libelous and was false, untrue, and unauthorized, was not objectionable as stating that the whole article was untrue, where the court also charged that the undisputed fact was that plaintiff killed the other person and defendant had the legal right to publish that fact.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 705–707; Dec. Dig. ⬅296(1).]

4. LIBEL AND SLANDER ⬅7(6) — WORDS ACTIONABLE—CHARGE OF CRIME.

A charge published in a newspaper that plaintiff assassinated another is libelous per se.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 31, 33, 36, 43, 66; Dec. Dig. ⬅7(6).]

5. LIBEL AND SLANDER ⬅120(2)—ACTIONS—EXEMPLARY DAMAGES.

On publication of a letter from the sons of a decedent referring to the decedent as their father, and accusing plaintiff of assassinating him, where the newspaper had already published an account showing that it had in its possession facts showing that the killing was in self-defense, malice may be inferred authorizing an award of exemplary damages, though the publisher was not actuated by a feeling of ill will.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 351; Dec. Dig. ⬅ 120(2).]

6. LIBEL AND SLANDER ⬅120(2)—ACTIONS—EXEMPLARY DAMAGES — "GROSS NEGLIGENCE" —"MALICE"—"ACTUAL MALICE."

If the publication and circulation of an article was done in such manner and under such circumstances as to show a reckless disregard of the rights of plaintiff and of the consequences to plaintiff, the jury were authorized to infer "malice," since reckless disregard and want of care would amount to "gross negligence," which is equivalent to "actual malice," and exemplary damages might be allowed.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 351; Dec. Dig. ⬅ 120(2).

For other definitions, see Words and Phrases, First and Second Series, Actual Malice; Gross Negligence; Malice.]

7. LIBEL AND SLANDER ⬅124(3)—ACTIONS—INSTRUCTIONS—ACTUAL MALICE.

In an action for libel, it was not error to refuse a special charge defining actual malice.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 369; Dec. Dig. ⬅ 124(3).]

8. LIBEL AND SLANDER ⬅121(1)—ACTIONS—DAMAGES—AMOUNT AWARDED.

An award of $4,000 actual damages for publication of a charge that plaintiff assassinated another was not so excessive as to show that it was the result of improper motive or of passion or prejudice of the jury.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 353; Dec. Dig. ⬅ 121(1).]

Conley, C. J., dissenting.

Appeal from District Court, Liberty County; J. Llewellyn, Judge.

Action by B. E. Quinn against the Houston Chronicle Publishing Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Hunt, Myer & Teagle, of Houston, and E. B. Pickett, Jr., of Liberty, for appellant. Hightower, Orgain & Butler, of Beaumont, and Stevens & Stevens, of Liberty, for appellee.

BROOKE, J. This is an action brought for libel by B. E. Quinn against Houston Chronicle Publishing Company. Plaintiff resided in Beaumont, Tex.; defendant is a corporation, domiciled in Harris county, Tex.; and the action was instituted in the district court of Liberty county, Tex. The cause was tried before a jury on the 11th day of June, 1915, and verdict was returned for the plaintiff in the sum of $4,000 actual and $1,000 exemplary damages. Defendant filed its amended motion for new trial on the 16th day of June, 1915, and same was overruled on the 17th day of June, 1915. Exception was duly taken, and 60 days allowed within which to file bills of exception and statement of facts. Appeal bond was filed on the 3d day of July, 1915, and appellant now presents its cause in this court.

At the outset this agreement was made:

"It is admitted by the parties to the cause that the letter of Dudley and David O'Fiel, set out in the plaintiff's original petition herein, was in fact published by the defendant in its paper, the Houston Chronicle, and circulated, as claimed by the plaintiff in his petition. It is further admitted that the statements and matters of fact set out and contained in said letter, as published by the defendant, in so far as the same are complained of by the plaintiff in this case, were and are false and untrue, save and except the fact that plaintiff did kill the said John J. O'Fiel. It is furthermore admitted that the killing of said John J. O'Fiel by the

plaintiff, B. E. Quinn, was done in perfect self-defense."

The libelous article complained of reads as follows:

### "An Explanation.

"To the Editor of the Chronicle:

"In your issue of August 13, 1914, or immediately subsequent to said date, in publishing the account of the tragedy at Beaumont, Texas, by which my father, John J. O'Fiel, lost his life at the hands of P. A. Quinn, it seemed from the wording of the article that my father was made the aggressor in the affair. The article, while in many particulars correct, was, in recital of action, wholly incorrect, and the affair did not happen as the article stated.

"On the occasion of the tragedy, John J. O'Fiel was walking on the east side of a street which runs almost due north and south, going south alongside of a building in which his office was located, evidently with the intention of going to the office, the entrance to which building was made from this street Pearl, which runs north and south. As he passed along the street and on the sidewalk, and arrived parallel with the entrance, this party, Quinn, who was concealed behind a door, or some fitting in the entrance of the office building, fired from the direction of my father's O'Fiel's side, the bullet going into the side of the left arm near the shoulder, straight across and entering the heart, inflicting a fatal wound. While Quinn fired other shots afterwards from the vantage point of the store, no others took effect, all going wild. After he was fired upon, which was at close range, my father wheeled and fired three shots at Quinn, all of which took effect, during and after which this party, Quinn, turned and fled into a store. They had had a previous difficulty the same day, in which Quinn assumed the aggressive, and knowing him to go continually armed, my father secured the only present available means of defense, a light caliber pistol, for his own protection, and did not use it, until after he had been fired upon, as above stated.

"Because the article as previously published did not state the true facts relating to and concerning the affair, for which, however, we can hardly attach any blame to you, and, as published, did my father and his memory a grave injustice, we ask that you publish this letter, that he may be properly exculpated from any blame or censure in the eyes of the public, and that any reproach or discredit offered his memory in the minds of relatives and friends be removed.                    [Signed] David O'Fiel,
                              "Dudley O'Fiel."

[1] By its first assignment of error, the appellant challenges the action of the lower court in permitting the appellee, Quinn, to testify, over the objection made by appellant, that the appellee was shot through the lung and shoulder, and then and there permitting him to describe his injuries, and his confinement in the hospital. The testimony complained of is as follows:

Counsel for appellee asked the following question:

"In this suit, Mr. Quinn, you complain of an article or letter that was published in the Houston Chronicle, I believe on the 23d of August, 1914, purporting to have been written by David and Dudley O'Fiel to the Houston Chronicle, relative to the contention of the O'Fiels as to the killing of John J. O'Fiel, their father, by yourself. It has been admitted that the article as published and as alleged and complained of by you, that the same is false and untrue, as alleged by you, save and except the killing of O'Fiel. When was this article first called to your attention? Answer: Several days after it was published, and before I got out of bed. I am not positive whether I was still in the hospital or at the sheriff's residence. I was either in the hospital or at the sheriff's residence. I was in the hospital on account of having been shot by John J. O'Fiel. I was shot through the right lung and across the shoulder, hit in about three places. I think one bullet made two holes."

The defendant excepted, and the exception was overruled by the court. Later appellant introduced in evidence the article which was published on August 30, 1914, relative to the tragedy, in which John J. O'Fiel met his death, containing, among other things, portions of the testimony of the plaintiff relative to the tragedy, which testimony, among other things, showed that plaintiff was wounded by said John J. O'Fiel, and that plaintiff's condition was weakened, and that he suffered from the wounds he received, and that, owing to such weakened condition and suffering on plaintiff's part, he was not able to appear at the preliminary hearing or examining trial where he was charged with the killing of said O'Fiel. A part of this testimony so introduced by the appellant, is as follows:

"An interesting phase of the hearing involved the earlier proceedings in justice court. Owing to the weakened condition of the defendant, suffering from wounds received in the encounter, no testimony was offered at the preliminary hearing."

In the case of Gammel-Statesman Pub. Co. v. Monfort, 81 S. W. page 1032, on this question the court says:

"But, however, it appears from the record that the testimony here objected to was also brought out by the appellant on the cross-examination of the witness Jones. Such being the case, the appellant should not be heard to urge objections to its admissibility."

In T. & N. O. Ry. Co. v. McCoy, 54 Tex. Civ. App. 283, 117 S. W. 448, the court says:

"The court did not err in refusing to strike out the evidence. In this case it may be noted that, after appellant had objected to all the testimony of the witness Hanks, he was again cross-examined by appellant, and all of the evidence objected to again brought out, and it is in no position to object to the evidence."

See, also, on this proposition, Eastham v. Hunter, 98 Tex. 565, 86 S. W. 323; M., K. & T. Ry. Co. of Texas v. Pettit, 54 Tex. Civ. App. 358, 117 S. W. 895; I. & G. N. Ry. Co. v. Brice, 126 S. W. 615; Kincheloe Irrigation Co. v. Hahn Bros. & Co., 132 S. W. 81; Sullivan v. Fant, 51 Tex. Civ. App. 6, 110 S. W. 522.

If therefore it was error on the part of the trial court to permit this testimony, the appellant, having voluntarily introduced evidence of the same character, cannot complain of such error. The first assignment is therefore overruled.

[2] By the second assignment, appellant complains that the court erred in permitting the witnesses B. E. Quinn, Mike Welker, and Dr. A. A. Bailey, to testify that plaintiff had a good reputation, and they had never heard it questioned, defendant having objected to all such testimony, because plaintiff's repu-

tation had not been attacked, and that the same is irrelevant and immaterial to any issue in the case.

Plaintiff alleged, in substance, in his petition, that prior to the publication and circulation of the libelous article complained of, he had always enjoyed and sustained, among the people in general throughout East Texas, and wherever known, the reputation of a peaceable and law-abiding and worthy citizen, and that at all times prior to said date he bore the reputation of an upright and honest man, and was at all times prior to said publication held in high esteem by his friends, etc.

The appellant, in answer to this allegation, says:

"Answering allegation in paragraph 8 of said petition, wherein plaintiff pleads his general reputation and his standing in general among the people of East Texas, this defendant says it has not sufficient information upon which to base a belief."

In the case of Houston Chronicle Publishing Company v. Tiernan, 171 S. W. 544, the court says:

"Plaintiff was permitted to testify, over the objection of the defendant, that many years ago he had held several offices in Galveston, and that: 'Up to the time of the publication complained of, my wife and I were reputed of good name and character and reputation. We were of good reputation as lawyers and persons.' Appellant, by its first assignment of error, complains that the court committed prejudicial error against it by admitting this testimony. The contention advanced by the proposition under this assignment is that: 'In an action for libel, a plaintiff is not permitted to introduce evidence of his good character and general reputation, and the fact that he has been an office holder, unless his reputation has been first attacked by the defendant.' Subject to certain explanations, we can readily agree with this contention. We do not understand that the attack by the defendant upon the character or general reputation of the plaintiff, in order to admit such proof as here complained of, must be made through witnesses placed upon the stand at the trial. It is enough that the publication against which the defendant is called to answer is itself such an attack, or that such an attack is made by the defendant's pleadings, or that the nature of the action involves the general character of a party or goes directly to affect it. Houston Electric Co. v. Faroux, 125 S. W. 924; Nettles v. Somervell, 6 Tex. Civ. App. 627, 25 S. W. 658; Timmony v. Burns, 42 S. W. 134; King v. Sassaman, 64 S. W. 937."

In King v. Sassaman, 64 S. W. 937, the court said:

"We are also of the opinion that the court erred in refusing to permit plaintiff to prove her good reputation for chastity. Of course, the general rule is that one cannot put in issue his own character, because it is presumed to be good; but when the nature of the action involves the general character of the party, or goes directly to affect it, such evidence is admissible. * * * We think this case falls within the latter rule."

In the instant case, plaintiff's character and reputation were involved in the nature of the case. It was put in issue by the pleadings in the case. While no direct issue was made in the pleadings, it was affirmatively alleged in the plaintiff's petition, and defend-ant, in its reply, simply stated it was not advised in the premises. We think there was no error in the admission of this testimony, and said assignment is therefore overruled.

[3] By the third assignment of error, the action of the lower court is assailed in paragraph 2 of its general charge; the claim being made that the same is too general, in that it charges that the article complained or by plaintiff was false and untrue and unauthorized, and does not limit the untruthfulness to the matters complained of by plaintiff, and charges that the whole article was untrue, while many pertinent facts stated in said article were admitted as true by all parties. The portion of the charge complained of is as follows:

"You are instructed that the article complained of by plaintiff is and was libelous, and that the same was false and untrue and unauthorized."

We have heretofore set out in this opinion the agreement of the parties, by which it was admitted that the statements and matters of fact set out and contained in the letter, as published by appellant, in so far as the same are complained of by the plaintiff, were and are false and untrue, save and except the fact that the said plaintiff did kill the said John J. O'Fiel. It was further admitted that the killing of John J. O'Fiel by the plaintiff, B. E. Quinn, was done in perfect self-defense.

In addition to the admission of the appellant, as above, the appellant asked a special instruction, which was given by the court; said instruction being as follows:

"At the instance of the defendant herein, you are further instructed as follows: The undisputed facts in this case show that the plaintiff, Quinn, killed John J. O'Fiel, and, this being true, the defendant had the legal right to publish such fact, and therefore, in arriving at your verdict, and in the event you should assess damages against the defendant, you are instructed that you cannot assess damages against defendant for publishing the fact of such killing."

It being admitted that the article was false and untrue, and it being libelous per se, it was the duty of the court in the charge to tell the jury that the article was libelous within itself. The said assignment is therefore overruled.

[4, 5] It is complained in the fourth assignment of error that the court erred, in paragraph 3 of its general charge, in submitting to the jury the issue of exemplary damages, because there were no facts pleaded or proved which authorized the recovery of exemplary damages.

Keeping in view the admission of appellant that the article, as published, was false, and bearing in mind the testimony of appellant's managing editor that upon the face of the libelous article complained of appellee was charged with the deliberate assassination of O'Fiel, and the further testimony that the paper knew that the article complained of came from the sons of the dead man, because

the article says "my father," we will examine this contention of appellant.

The article upon its face was libelous. There can be no question that the charge of assassination is libelous per se. Therefore malice will be inferred.

As to exemplary damages in cases of this kind, in our state, a brief reference to some of the authorities will be helpful.

An eminent writer says:

"In the jurisdictions where punitive damages are allowed, there is a difference of opinion as to the necessity of actual or express malice to support a finding of such damages, some courts holding that evidence of express malice is necessary, that the injury must result from a willful wrong or conscious indifference to results. The malice in such cases may be proved directly or indirectly, that is, by direct evidence of evil motive, and intent, or by legitimate inferences to be drawn from other facts and circumstances evidenced by evidence of personal ill will or animosity on the part of the defendant, or may be inferred where the libelous article was recklessly or carelessly published." Newell on Slander and Libel, p. 1020; Davis v. Hearst, 160 Cal. 143, 116 Pac. 530.

In the case of King v. Sassaman, 54 S. W. 305, the court says:

"The malice, to sustain an action for exemplary damages, may be implied malice—implied or inferred from the wrongful acts committed. Am. & Eng. Enc. of Law, 433, Note 1. "It was held in Cotula v. Kerr [74 Tex. 89] 11 S. W. 1058 [15 Am. St. Rep. 819], that the malice necessary to exemplary damages in a case of libel might be inferred from the absence of probable cause for making the publication, or upon evidence of express malice. It was held in Beloe v. Fuller [84 Tex. 450] 19 S. W. 616 [31 Am. St. Rep. 75], that, if the words published were actionable per se, compensatory damages may be recovered in the absence of malice. It follows that, if the charge be made maliciously, other damages of a punitive character are recoverable.

"In Railroad Co. v. Richmond [73 Tex. 568] 11 S. W. 555 [4 L. R. A. 280, 15 Am. St. Rep. 794], it is stated that exemplary damages may be recovered in libel suits where it is shown that the libel was published upon express malice, but it is not to be inferred that it may not be recovered upon implied malice. The court's charge is correct, as far as it considers authorizing exemplary damages if the words were spoken upon express malice; but it should have allowed damages upon malice, either express or implied. The language alleged to have been used charged plaintiff with a want of chastity, positively or in the negative, and is actionable per se; it being shown that plaintiff did have the disease mentioned, in which case the defendant accused her of having contracted it from some person other than himself. Zeliff v. Jennings, 61 Tex. 466."

In the case of Fessinger v. El Paso Times Co., 154 S. W. 1175, the court says:

"Exemplary damages are not recoverable unless the libelous language was instituted by malice. This may be shown by evidence of personal ill will or animosity on the part of the defendant, or *it may be inferred* (italics ours) where the libelous article was recklessly or carelessly published. Cotula v. Kerr [74 Tex. 89, 11 S. W. 1058, 15 Am. St. Rep. 819], supra; King v. Sassaman, 54 S. W. 304; 25 Cyc. 538."

Continuing, the court says:

"In the one case it is termed 'express malice,' and in the other 'implied malice.' The distinction, however, is in name rather than in fact, and it is malice whether it be proven by direct evidence, as in the one case, or inferred from recklessness or carelessness in the other, and, whatever may be its nature, it is the right of the defendant to offer in evidence any fact or circumstance otherwise properly admissible which would tend to rebut any evidence of malice offered by the plaintiff."

In the case of Pennsylvania Iron Works Co. v. Henry Voght Mach. Co. (Ky.) 96 S. W. 553, 8 L. R. A. (N. S.) 1023, the court used the following language:

"In Courier Journal Printing Co. v. Sallee, 104 Ky. 335, 47 S. W. 226, it is said: 'It must be remembered that the law always presumes that, in the publication of an article which is libelous on its face, it was published with malicious intent, and this presumption remains throughout the entire case until it is rebutted by proof of the contrary motive. In this state in all actions for torts, punitive damages are allowed where the injury is a result of a wanton or grossly negligent act. The intention of the person is not a necessary ingredient. This is especially true where the words published are actionable per se.' Newell on Slander & Libel, p. 843. The letter in this case being libelous per se, the presumption is that it was published with malicious intent, and, this question having been submitted to the jury under proper instructions, they had the right in their discretion to find punitive damages against appellant."

We are cited by appellant to the case of Houston Chronicle v. McDavid, 173 S. W. 468, and we are invited to compare the testimony in this case with that in the McDavid Case for the purpose of discovering any distinction between the cases, so far as the issue of exemplary damages are concerned, and we are asked by appellant to examine the record in this case for the purpose of discovering any evidence which shows a wrong done to plaintiff by defendant in such a reckless and wanton manner as to indicate an utter disregard of the consequences.

In the case of Houston Chronicle Co. v. McDavid, the court said:

"On this appeal we have given the entire case a careful reconsideration, and have reached the conclusion that it should be reversed, because the testimony does not support the verdict for exemplary damages. In order to recover such damages, it was necessary for the proof to show actual or express malice. The undisputed testimony clearly shows that the agent of appellant who caused the publication to be made was not acquainted with appellee or his wife, nor with either of the parties to the divorce suit, and had no ill will against either of them. But it is contended on behalf of appellee that the testimony shows such gross indifference to the rights of others on the part of appellant as amounts to a willful or wanton act, and if it does it will support the finding of actual malice: but we have been unable to find any such testimony in the record. The proof shows that the copy or transcript from which the publication was made was submitted by a reporter of the Chronicle to Mr. Gillespie, the managing editor. It seems that the document submitted had the names of the parties to the divorce suit and the specific court in which that suit was pending, and Mr. Gillespie, to use his language, 'edited them out of it.' In support of their contention that evidence was submitted justifying a finding of actual or express malice, counsel for appellee make the following statement in their brief:

"'Plaintiff also offered in evidence on this issue the answers of the witness C. B. Gillespie

to cross-interrogatories propounded to him. This witness testified: "I do not remember the publication of any other part of the pleadings in the suit of Fisher v. Fisher." The following question was propounded to the witness: "If, in answer to direct interrogatories propounded to you, you reply to the effect and in substance that, prior to the publication of the matter complained of, you did not know Dock McDavid and wife, or their residence, and that you have had no business dealings with them, or either of them, and that you did not know that they were the parents of Mrs. Allison, formerly Mrs. Fisher, then please state what efforts, if any, you made to acquaint yourself with such matters?" His answer was: "I made no efforts as no names were used in the article. Whether I took into consideration, prior to the publication of the matter complained of, the fact that the matter so published might reflect discredit, shame, and humiliation upon the parties to whom it referred, and that upon the reading thereof it might wound their feelings, and cause them, or any of them, mental distress and anguish, * * * I did not consider the article as one identifying any of the parties. Whether I knew, upon reading the matter complained of, that the paragraph following the words 'an inherited disposition' referred to the parents of Mrs. Fisher, I did not give special consideration or thought to any particular portion of the article, as I considered a story without names entirely general."

" 'During the course of cross-examination of the witness C. B. Gillespie, it was agreed that in the original answer filed by the defendant in the divorce suit by the defendant in the case of Fisher v. Fisher, in which the plaintiff was the daughter of Dock McDavid, the words "her mother" were not in there, and that there was no reference to the mother whatever in this answer purporting to be published by the newspaper. The witness C. B. Gillespie, on cross-examination, testified as follows: "I said a while ago that I left the names out as a matter of safety. I mean by that, * * * well, safety to the publishers. It would have been privileged under the law to publish it with the names. Whether that is a matter of opinion, * * * you asked me that, didn't you? As to what I mean by 'safety' in leaving out the names, whether I wanted to protect myself against a possible suit for damages, I cut out the names so that it would not refer to anybody in the world. It might as well have been somebody in South America, Asia, or Africa. I said I cut the names out as a matter of safety to the publishers. As to what I feared might happen to the publishers if the names were connected with the article, * * * a number of things might occur. Ordinary items in the paper, people come to us and ·telephone us. * * * It requires space given them. People come in and say: 'Well, you published this; now you must publish our side of it.' It takes up columns and columns of space. We do that cheerfully because we do not want to put anybody in the wrong light. We want to treat everybody exactly alike, but by the elimination of the names absolutely I thought it would place the matter beyond anybody ever coming to see if there would be something more about it. That is what I mean. Whether I thought only a question of safety was involved, * * * always a question of safety in connection with liability. I did not say that I left out the names in order to avoid a possible suit, for publishing it, for damages. I say there is always a question of liability. We are always looking out for lawsuits. Whether I realized that at the time, * * * I realized that all the time; yes, sir. Whether under ordinary circumstances, just publishing matters I am privileged to publish, which I am entitled to publish, that I do not have any fears as that, * * * I never passed on an item in my life without applying the golden rule where I feared

184 S.W.—43

a right. Yes, I applied the golden rule to this article. I did. I treated those people like I wanted to be, if I was in their condition. I knew the names referred to by the reporter were in there. I did not know the parties personally. I had no ill will against them in the world. I had no antagonism against them. I had no interest in publishing anything that might injure them. ·Whether I made an investigation to determine the standing of the plaintiff in this suit, and that of his ·wife, * * * I did not name the plaintiff in this suit, or his wife. There was no necessity for that. I knew the article referred to the mother of the plaintiff. I could not tell from the article anybody's name. The article published did not refer to any plaintiff, or defendant, or anybody. I did not ascertain who that mother was, and her standing, because we took the names out of it. No, I did not know that anybody would know, from the reading of that article, that it referred to the mother, and that they would know who that mother was, or afterwards find out and ascertain by investigation, and that it might injure them. I did not know that. I did not know that it would injure anybody. As to why I wanted to be safe about it, * * * because there might be a difference of opinion between them and me about that, as to that. Whether I made an investigation to determine who the mother was, * * * I cut the names out. I made no investigation to find who the mother was. I never did; no, sir. At the time I published that article, I took into consideration the fact that the article as it was published might humiliate and shame the parties to whom it actually did refer, and injure them in their good name and reputation. I always take that into consideration—those facts. Whether at this time I took it into consideration, * * * I do not think that I went into the article any more than to revise it, and make it refer to nobody. I do not remember that point. I really do not. Yes; I know as a matter of fact that the records of the courts are open to all parties. I know that. I believe anybody who wishes to do so can go to the courts, notwithstanding no names are mentioned, and find the actual answer, together with the names of the parties to the suit. I believe that would have been the case, whether ther was any publication or not. Anybody can go to the courts. If anybody was interested to find out who the parties were after seeing the publication, I think that they could go to the courts and ascertain anything on file at that time. I knew that at the time, undoubtedly. Everybody knows that." Again: "Whether, in my capacity as editor, I published any other of the proceedings, the pleadings in the divorce suit of Fisher v. Fisher, * * * my recollection is that we did not publish anything in connection with the divorce suit of Fisher v. Fisher. We published the answer in the divorce suit, but it was not; * * * it had nothing to say about Fisher v. Fisher; nothing to say about them whatsoever. I knew when we published it and had knowledge that it was in that particular suit." Again: "Ordinarily, and usually, all court news is published under the head of 'Court Routine.' Ordinarily, under that head we have two or three paragraphs in regard to particular suits, which we regard as unusual, calling attention to the nature of the suit. These are called 'leads,' explaining the nature of the suit, especially if the matter is of unusual interest. Whether it is a very rare thing for us to publish the pleadings, * * * we went over that awhile ago, that particular question, I think." '

"That statement is as strong in appellee's favor as the record will justify; and, in our opinion, while it might perhaps support a finding of slight negligence, it falls short of showing gross negligence or gross indifference to the rights of others. On the contrary, the proof shows that the managing editor, before authorizing the publication,

attempted to make such changes in it as would prevent identification of any persons therein referred to. This effort, although it may not have been successful, shows clearly that the managing editor was not guilty of gross indifference or willful or wanton wrong. Nor is it any answer to this to say that in exercising the care referred to Mr. Gillespie was merely attempting to avoid a libel suit. A willful or wanton act or gross indifference, as used in the definition of 'malice,' means an act done with the specific intention to injure the person that was injured, or an act done with such utter recklessness as to indicate a disregard of consequences. The act here complained of was done in due course of business. That business was the publication of a daily newspaper; and, no doubt, the duties of the managing editor of such a publication are not only arduous, but the very nature of the business requires them, in many instances, to be performed with great celerity. By a given hour the editorial department must furnish sufficient copy to fill a designated amount of space in each issue of the paper; and therefore it is no doubt true that, on many occasions, that department, and especially the managing editor, is compelled to work in haste. But, notwithstanding these facts, as stated before, the testimony shows that in this case the managing editor made an effort to have the publication in question couched in such language as would prevent identification of the persons therein referred to; and the effort so made, though it may not have been successful, *negatives the charge of gross negligence or indifference.* (Italics ours.) Nor was such wrongful conduct shown by the fact that the editor made no effort to ascertain more than he then knew concerning Mrs. Fisher, the plaintiff in the divorce suit, or Mr. and Mrs. McDavid, her father and mother. The proof that he did not know them and never had any dealings with them was pertinent for the purpose of negativing the existence of ill will; and the fact that, if he had waited and attempted to do so, *he might have ascertained* (italics ours) more about them, does not prove gross indifference or a willful purpose to injure them.

"So, our conclusion is that the assignments of error which present the contention that the testimony does not support a finding of actual or express malice must be sustained."

In the instant case, the libelous article complained of having heretofore been set out, and the admission that it was false and untrue, the plaintiff introduced evidence that the appellant, on August 13, 1914, which was ten days prior to the publication of the alleged libelous article, published an article which shows on its face that on said 13th day of August, 1914, the appellant was informed and well knew that appellee acted in his own self-defense at the time he killed John J. O'Fiel, and that appellant was fully aware, even in detail, as to how the homicide occurred, and that appellant was well aware of the fact that appellee was not lying in wait for the said John J. O'Fiel, and that appellee was not in any manner secreted or hidden from the said O'Fiel at the time of the homicide; but, on the contrary, it is claimed said article shows on the date last mentioned appellant was informed and well knew that the said O'Fiel was the aggressor, and brought on the difficulty which resulted in his death, and that he attacked and several times fired his pistol at the appellee before appellee attempted to defend himself against such assault.

Now, as sustaining this contention, we set out the greater portion of said article, which is as follows:

"John J. O'Fiel Shot and Killed at Beaumont.

"Special to the Chronicle.

"Beaumont, Texas, August 13.—John J. O'Fiel, a lawyer, 64 years old, was shot and killed late yesterday afternoon in the entrance to the store of Willis G. Blanton on Pearl street. B. E. Quinn, a real estate dealer, was shot through the right lung and received a flesh wound across the back. He is at the Sisters' Hospital and physicians state that he has a fair chance to recover. The duel took place at a time when the street was thronged with people, and created a great deal of excitement. Pistols were used and from six to eight shots were fired. The body of Mr. O'Fiel was sent to Wichita Falls, where the funeral and burial will take place.

"The law offices of the decedent and his son, David O'Fiel, are on the third floor of the Temperance building and Mr. Quinn had his offices on the same floor. The two men had a slight disagreement over some small matter and earlier in the afternoon they had met in the lobby of the Temperance building and after exchanging a few words they became angered.

"Quinn was Standing on Curb.

"When the shooting began, Mr. Quinn was standing on the curb in front of the lobby in the Temperance building, talking to three friends. Mr. O'Fiel was first seen by a number of people to start from the west side of the street in the vicinity of the Caswell-Preston drug store. He crossed at an angle which brought him about opposite the Quinn party. As he reached the middle of the street he drew a pistol and fired.

"Mr. Quinn turned and ran toward the Blanton store, missed the entrance and threw both hands against the wall. In the next instant he ran into the store. Meanwhile Mr. O'Fiel was moving toward Quinn and firing. Quinn passed into the store and went behind a table of clothing, and turned there and began firing. Mr. O'Fiel fell in the entrance of the Blanton store. Mr. Quinn ran out of the store and went into the store next door and was later removed to the hospital.

"A number of physicians came to the assistance of Mr. O'Fiel, but he died within a few minutes and did not speak after he fell. The physicians and others who examined Mr. O'Fiel were unable to find the bullet wound for some time, and eventually could find no other trace of the bullet than in the left arm just below the shoulder. It did not appear that this would cause death and continued examination failed to reveal any other wound. Finally, however, the physicians asserted that life was extinct, and the body was removed to the undertaker's. There a more careful examination of the wound disclosed that the bullet had entered the left arm just below the shoulder and had passed into the body and probably thru the lungs. It is believed that an artery was severed and that internal hemorrhage caused death.

"Twice Hit with Bullets.

"At the hospital it was ascertained that Mr. Quinn had been twice hit with bullets. One bullet had passed across his back and twice cut the flesh just over the shoulder blades. The other bullet passed into the body penetrating the lower part of the right lung. The physicians were unable to make definite answer as to whether this bullet entered the back or the breast, or whether there were two bullets, one entering the breast and the other the back. The wound in the breast might have been caused by something other than a bullet, and if so, the bullet which entered the back is still in the body. It may be that the bullet passed through and through the body, and in that event the

physicians could not say whether it entered from the back or the breast. The wound was not probed and only a thorough examination later will disclose the exact condition of the wound.

"Mr. Quinn withstood the shock well and after the wounds were dressed his condition was reported good and his chances for recovery were pronounced good. There is danger of complications from a wound in the lung, but these can not be forecast or anticipated."

The testimony shows that, at the time appellee killed John J. O'Fiel, appellant had a regular reporter and representative in the city of Beaumont, who regularly gathered and reported news items to appellant. This reporter was in the city of Beaumont on the day of the homicide, and was there also on the day of the habeas corpus hearing, representing the paper as its reporter and agent.

The witnesses to the shooting, it appears from the record, most of them, are residents of the city of Beaumont, and their places of business are on Pearl street, upon which said street the shooting occurred. All of the witnesses, so far as can be ascertained from the record, were easily accessible.

As above shown, appellant's reporter informed appellant, prior to the publication of the alleged libelous article, as to how the killing of OFiel came about. It seems that he had talked with a number of witnesses to the shooting, and made up his report of the same. Mr. Gillespie, the managing editor, testified that he did have a reporter and representative in Beaumont at the time of the killing of O'Fiel by plaintiff, whose duty it was to furnish such news to appellant, and such reporter was in a position to learn how the killing occurred, and that is the way the paper gets the news.

Quoting from his testimony further, Mr. Gillespie stated:

"But if the article is false and untrue, then the article is libelous on its face. * * * According to the two boys' version of the trouble, the article does charge Quinn with the deliberate assassination of O'Fiel. It would seem, according to their version of that, it does charge that. My paper published that article, but I didn't know anything about it. The paper knew that the article came from the sons of the dead man, because the article says 'my father.' I know now that the article misstated the facts, but I didn't know it before it was published, because I didn't read the article. The killing occurred 11 days before the publication of the article from the two O'Fiel boys, and during that time we had a representative of the Chronicle in Beaumont. * * * I was in Houston, but we had a reporter and representative there to furnish the news to us, and he was in a position to learn how the thing occurred. I do not admit that the article shows on its face a deliberate assassination of John J. O'Fiel, by Mr. Quinn, but I admit that the two boys make out that kind of statement. The article didn't impress me as being anything important. I did not pass on the article before it was published, and have no idea what the man that took it to the composing room thought about it. I cannot tell what I would have done if I had seen the article before it was published, whether I would have let it go in the paper in that form or not. If that article had been brought to me personally, my objection, if I had made such, would have been that it was controversial in its nature, and calculated to make it nec-

essary for us to publish a reply from Mr. Quinn, and, whenever you publish an article in the paper and somebody challenges it, it goes to discrediting the accuracy of the paper to that extent. I might have found other objections to it, but I can't tell you whether I would have or not; can't say what I would have done."

It will be noted, and the testimony shows, that Mr. Gillespie did not attempt to deny knowledge of the facts connected with the killing of O'Fiel by plaintiff, as published in appellant's paper on August 13, 1914, nor did he testify that he had any reason to doubt the truth of the statements made in said article of August 13, 1914, said statements being sent by the reporter of his paper, and showing that appellee was justified in killing O'Fiel, and contradicted the libelous article of August 23d, following. It will be noted further that Mr. Gillespie stated that the paper knew that the libelous article came from the sons of the dead man; that the statements in said libelous article did not appear to Mr. Gillespie as being important. Nothing in the record appears showing that any effort was made before publishing the libelous article to verify its statements, the paper having doubtless in its own files the statements made by its reporter and representative in Beaumont.

Upon comparison of the instant case and the McDavid Case, it will readily occur, to, perhaps, any one, that there is a vast amount of difference. In the McDavid Case great care and caution was exercised by the newspaper, and, if there was any negligence whatever, the same was very slight.

In the instant case, the true facts, as shown by the preliminary examination, were in possession of the appellant. We do not believe that the fact that the managing editor did not authorize the publication of the article, and that the paper was not actuated by a feeling of ill will, would excuse the inference of implied malice. But no care whatever seems to have been exercised, and the jury in the case were authorized to infer that the appellant was grossly negligent, and showed a reckless disregard of appellee's rights, indicating an entire disregard of the consequences that might follow from the publication of said article. At least, it was a question of fact for the jury trying the case, it was their province to pass upon the credibility of the witnesses, to judge of the weight and value of their evidence, and their province to take into consideration the fact that Mr. Gillespie was an interested witness, and to consider all the facts and circumstances and inferences in passing upon this question.

We believe that the issue of exemplary damages was raised by the evidence, was properly submitted to the jury, and that therefore the above assignment should be overruled.

[6] The appellant complains that the court erred in paragraph 3 of its general charge, in permitting plaintiff to recover exemplary

damages, "if the jury should find that the defendant was guilty of gross negligence toward plaintiff in publishing and circulating said article," thereby wholly ignoring the issue of actual malice as a necessary ingredient to the recovery of exemplary damages.

The charge of the court on this matter was as follows:

"You are instructed that if you shall believe from the evidence that the defendant, in publishing and circulating said article complained of by the plaintiff, was guilty of gross negligence toward the plaintiff, then in addition to such actual damages as you may allow plaintiff, as hereinbefore explained, you may, in addition thereto, allow him such further sum by way of exemplary or punitory damages, as you may deem proper to allow under the facts and circumstances in evidence before you.

"By the expression 'gross negligence,' as herein used, is meant that the publication and circulation of said article by the defendant was done in such manner and under such circumstances as to show a reckless disregard on the part of the defendant towards the rights of the plaintiff, and so wholly without care as to indicate an entire disregard of the consequences to plaintiff that might follow from the publication and circulation of said article."

If the publication and circulation of the article was done in such manner and under such circumstances as to show a reckless disregard on the part of the defendant towards the rights of the plaintiff, and so wholly without care as to indicate an entire disregard of the consequences to plaintiff, then the jury were authorized under the law to infer malice, for in law a reckless disregard and an entire want of care on the part of the plaintiff would amount to gross negligence, which is equivalent in law to actual malice. The said assignment is overruled.

The sixth assignment of error complains of the court's charge as not having given a correct definition of the term "gross negligence." The said assignment is overruled.

Complaint is made by the appellant, in its seventh assignment of error, of the court's action in refusing to give defendant's special charge No. 1, which was a peremptory instruction to find in favor of defendant for exemplary damages, for lack of evidence to sustain such action.

What we have said heretofore disposes of this assignment. It is therefore overruled.

[7] By the eighth assignment, the action of the lower court is challenged in refusing to give defendant's special charge No. 3, which gave a definition of actual malice; it being complained that the general charge was silent on that issue, and the plaintiff having pleaded that defendant was guilty of actual malice in making the publication.

The said assignment is overruled.

By the ninth assignment, the verdict of the jury is assailed as being contrary to the law and the evidence, for the reason that there was no evidence in the case upon which the jury could properly base a finding against the defendant for exemplary damages.

Under the facts of the case, we believe the jury were authorized in their finding against appellant for exemplary damages.

[8] By the tenth assignment, complaint is made that the actual damages found were grossly excessive and without sufficient evidence to support it; the facts showing no injury to appellee's business, and showing a prompt retraction and vindication of plaintiff by defendant.

From the record before us, we find nothing to show that the jury was actuated by any improper motive, and, they having found a verdict against the appellant for the sum of $4,000 actual damages, we are not prepared to say that the same was excessive.

This assignment is therefore overruled.

By the eleventh assignment of error, the verdict of the jury is challenged as being so grossly excessive as to show that it was the result of passion or prejudice superinduced by the injection in the pleadings, in the court's charge, and in argument of plaintiff's counsel.

We find nothing in the record to bear out the contention of appellant. Therefore this assignment is overruled.

Finding no error in the record, this case is in all things affirmed.

It is so ordered.

CONLEY, C. J. (dissenting). I am of the opinion that the verdict of the jury in this case for actual damages is grossly excessive, and without sufficient evidence to support and maintain the amount awarded. The record shows that the appellant made a prompt retraction through its paper, a Sunday edition, of the libelous article, about appellee, and the fact is undisputed that the appellee, by reason of such article, has suffered no injury to his business, nor any substantial damage to his reputation. After the publication of the O'Fiel article, the record shows that the appellee wrote to appellant the following letter:

"Beaumont, Tex., August 28, 1914.

"Mr. Marcellus E. Foster, President Houston Chronicle Publishing Co., Houston, Tex.—Dear Sir: I respectfully call your attention to a publication on page 42 of the Chronicle of Sunday, August 23, 1914, headed 'An Explanation,' and signed 'Dudley O'Fiel,' 'David O'Fiel.'

"Even a cursory perusal of that publication will certainly convince you that it is libelous. Doubtless you would have published a communication from me controverting the statements contained in that, but I depended upon the sworn testimony in the case, taken from the record of the court, to dispute such uncorroborated accusations, based entirely upon hearsay statements. I am somewhat disappointed, however, to read in the Chronicle of August 27, page 12, a very general report of the facts proven in the habeas corpus hearing, after the specific allegations of lying in wait, etc., published against me in the Chronicle of August 23d. The court stenographer took the testimony, and I respectfully refer you to that of the witnesses, Chas. Abbott, John H. Brooks, Officer Bailey and B. E. Quinn, which was corroborated by a number of other witnesses. The publication of which I complain was made in a Sunday Chronicle to give the widest circulation of it in a great

metropolitan journal. I believe that you will correct the injury done me in your paper by publishing in Sunday's issue the testimony of the principal witnesses whom I have named herein. The testimony of the many other witnesses was likewise corroborative.

"Yours very truly, [Signed] B. E. Quinn."

In response to this letter, the following letter was sent by the assistant general manager of the Houston Chronicle Company to Mr. Quinn:

"August 31, 1914.

"Mr. B. E. Quinn, Beaumont, Tex.—Dear Sir: Your letter of August 28th to Mr. M. E. Foster came to hand Saturday afternoon, August 29th. In his absence from the city on receipt of this letter, we immediately called up the Beaumont correspondent and asked him to get us a copy of the evidence which you outline, and which he forwarded to us by special delivery. In the meantime, we ask you to send a copy of the evidence, or a copy of a newspaper in which it appeared. We are, of course, very glad to publish this evidence, and thank you for your cordial letter.

"Yours truly, ————,

"Assistant General Manager,

"Houston Chronicle Publishing Company."

On August 29, 1914, the Houston Chronicle sent Mr. B. E. Quinn the following telegram, the same also being in response to the letter written by Mr. Quinn on the 28th inst.:

"Houston, Texas, August 29, 1914.

"Mr. B. E. Quinn, Beaumont, Texas. Please send under special delivery to-night copy of evidence mentioned in your letter to Mr. Foster. If this evidence appeared in any Beaumont paper, just mail us clipping under special delivery.        The Houston Chronicle."

In reply to this telegram, Mr. Quinn sent the following telegram to the Houston Chronicle:

"Beaumont, Texas, August 29, 1914.

"The Houston Chronicle, Houston, Texas. Am sending clipping by special delivery, which gives a part of the evidence. Save half a page for me.        B. E. Quinn."

On Sunday, August 30, 1914, the Houston Chronicle Company published Mr. Quinn's testimony, and made a full and complete exoneration of Mr. Quinn. That article was prominently headed "B. E. Quinn Exonerated," and then proceeded as follows:

'District Judge Orders His Discharge After Hearing on Habeas Corpus Writ at Beaumont.

"Beaumont, Texas, Aug. 29.—Testimony exonerating B. E. Quinn charged with the killing of John J. O'Fiel, was offered at a writ of habeas corpus hearing before District Judge W. H. Davidson. As a result of the hearing Judge Davidson held Quinn blameless in the encounter and ordered his complete discharge from custody.

"Quinn was represented by Colonel A. J. Houston, and County Attorney Marvin Scurlock represented the state. No evidence was presented by the state and no argument was made at the conclusion of the testimony. Mr. Scurlock stated that the evidence showed as clear a case of self-defense as could be established, and the court immediately pronounced the verdict: 'The defendant is discharged.'

"The hearing was concluded with the testimony of Quinn in his own behalf. Excepting for questions propounded by his attorney, Quinn began his recital with the incident which caused the first interruption of the friendship between Quinn and Judge O'Fiel and continued with a fairly well connected narrative on down to the shooting and up to the time he relinquished his pistol to Police Officer Bailey in the Abelman harness store. While there was much detail in Quinn's story not heretofore published, his testimony did not vary in the main facts of the shooting affray, save in one particular, where it was stated that Judge O'Fiel backed into the elevator after their brief encounter in the lobby of the Temperance building early in the afternoon. The testimony shows that Quinn backed through the lobby until he got into the elevator and ran the car up to the third floor himself, leaving Judge O'Fiel in the lobby.

"Start of the Trouble.

"Beginning at what he described as the starting of the bad feeling between himself and Judge O'Fiel, Mr. Quinn said that it was in June that he found a purchaser for a piece of Sour Lake oil land owned by Judge O'Fiel. The deal went to the extent of the prospective purchaser putting up earnest money. Subsequently the deal fell through and Quinn claimed that a commission was due him for finding the purchaser. At the same time the deal fell through, Quinn said, there was a little difficulty in Judge O'Fiel's office, when, he said, Judge O'Fiel threatened to throw an inkstand at him, and pushed him out of the office. From that time on, Quinn said, O'Fiel did not look at him.

"Quinn filed suit on July 29th against Judge O'Fiel for the commission.

"A few days before the tragedy it appeared to Quinn, he said, as though Judge O'Fiel was inclined to speak. On one or two occasions, Quinn said, he had nodded at the judge as they passed.

"Meet in the Lobby.

"Coming to the day of the tragedy Quinn said: "'About 1 o'clock on that day I met him as I was going to the post office. I said, 'How do you do Judge?' and he went on and didn't speak. As I returned from the post office he was leaning up against the entrance there of the Temperance building and I came along about the entrance going to my office, and he called me. He was talking to M. A. McKnight, and when I started to go by, he said, "Say Quinn, come here," and advanced toward me.

"'I walked toward him and he came along and commenced to curse me and said, "Damn you," and he stuck his finger right up in my face and told me never to speak to him again. I had already taken all I thought I could take from any man; he had already kicked me out of his office, and when he came up and pointed his finger in my face and commenced cursing me on the street I hit at him, and when he ran at me with his knife, I kicked him. In the meantime I had a little knife—I think I have it now—and when I was getting that little knife out he ran at me with his and I kicked him off. I didn't want to hurt him very bad anyway. About that time McKnight grabbed him, but McKnight was a small fellow and couldn't hold him, and he kind of dragged McKnight on with him and came toward me with the knife. I was going to the elevator and had got pretty near back to the elevator and some fellow shoved me back to the elevator. I don't know who the fellow was. There was no boy there with the elevator. I supposed the power was off. By that time Judge O'Fiel ran back with his knife like he was coming into the elevator, and when he did that I kicked him again. Just then some fellow said, "Shut the door and go on up," and I shut the door. I didn't know whether the power was on or off, and I just tried it and went on up to my office.

"'I think I hit him a back handed lick with my left hand. That was the hand nearest him. I am pretty sure that's how I struck him, because I had a little skin rubbed off my fist. I stepped back to see what he would do. If he was going to fight I could brace myself and get a good solid lick on him. I was backing away all the time.'

## "Difficulty with Dave O'Fiel.

" 'About twenty or thirty minutes after that, Dave O'Fiel came down to the office. I was fixing to arrange some papers and I had my side turned to the door. He rushed in and come after me and hit me before I knew he was in the office at all. Then we had it round and round up there. We clinched and fell and rolled around the office there. Three or four fellows came there and pried us apart. I don't think either one of us was hurt. When they pried us apart and I got up this automatic was laying on the floor. I asked a young fellow—I grabbed it as soon as I saw it—I said, "Whose gun is this?" He said, "I jerked it out of Dave O'Fiel's pocket." Dave O'Fiel was standing right on the inside of the door; V. A. Collins and Fred Jennigan and I think a man named Sessler that works for the Texas Company, and a half dozen were in there.

" 'A young fellow who was in my office went down on the street and he came back in a little while and said he heard Mr. O'Fiel making some threats down there, and he said he was out trying to get a gun. He said, "You had better look out." I went right straight and put my gun on. I had one lying right there on the desk and I armed myself and I went down on the street. I was fixing to go and see a fellow about selling a lot. I expected to find him at the Weller racket store. I think I had a blue print in my pocket. I started across the street and I happened to notice Abbott and Robichaux standing there and I stopped and shook hands with them. I suppose I was standing there about a minute when O'Fiel advanced with a gun. When I stopped there I stood on the pavement facing Mr. Abbott and Mr. Robichaux. They were standing on the sidewalk. I was facing with my back to the street standing on the pavement in front of the Temperance building. Mr. Abbott looked across the street. I don't know whether he said anything to me or not. I looked around and saw O'Fiel coming across the street. We were just discussing this O'Fiel trouble at the time, and I says—I believe I remarked, Abbott says he thought he remarked, but anyway somebody remarked— "There's O'Fiel now." By that time he had gotten to the middle of the street. He ran his hand into his pocket like that (illustrating) and I says, "Yes, and I believe he has got a gun." '

## "How Shooting Began.

" 'I stepped upon the sidewalk and kept thinking somebody— Everybody seemed to be watching him. I thought some one probably would grab him. I had all the opportunity in the world to pull my gun and shoot, but I just stood there until the man got within fifteen feet of me, and he says, "I have got you now," and pulled his gun out of his pocket. When he did that (I suppose that's how came Abbott to lose part of that shirt that he was telling about), I grabbed Abbott loose and made a bee line for the entrance of that store. When I jumped behind Abbott I was expecting all the time that somebody would grab O'Fiel. I thought if I jumped behind Abbott somebody would stop him, and Abbott twisted around there and broke loose from me. I think he was trying to make a get away. Anyway I got loose from him and made a run for that entrance.'

" 'Well, now, Mr. Quinn, did you attempt to fire, or take out your pistol and fire before you entered that building?' asked Colonel Houston.

" 'I could have fired before the other man got his gun out of his pocket.'

" 'Would it have endangered the life of bystanders on the opposite side of the street?'

" 'Yes, sir, I thought of all that. The first thing I thought was to get out of the way of O'Fiel. I didn't want to have to kill him. Then the next thought, I didn't want to injure any bystanders. I ran in the building.'

" 'What happened then?'

" 'He shot me twice before I got in the building.'

" 'You knew you were shot?'

" 'Yes, sir.'

" 'How did it affect you?'

" 'Well, it took my breath away.'

" 'Did you come near falling?'

" 'Yes, sir. I came near falling. I caught on the door as I ran in. I started over to the right. I got far enough over south of the door so if I did have to shoot I wouldn't shoot out of the door. When he came in he just leveled his gun down at me like that (illustrating) and I shot twice just as quick as I could pull the trigger. I am pretty sure that he shot about the same time I did. His bullet went wild. He never touched me after he got inside. When he came in the door and leveled his gun at me I fired, and I thought he was facing me the way you are facing me, but from the way he was hit he must have turned around like that. He was hit in the side I think.'

## "After the Shooting.

" 'After I shot I stood in my tracks and Dave came in and held his father's head like that, and said, "Oh, father, you are killed," or some remark like that. He looked up and saw me and made a run for me. Well, I didn't feel like I could move and started to shoot. I had the gun cocked when about half a dozen fellows rushed right in behind him. I didn't want to shoot him unless I had to as I knew I was taking desperate chances of hitting somebody else. I thought the best thing to do was to make it to the back door and cover him when he came out. When I got out of the back door I don't think he was over six feet behind me. I stood up against the wall and he ran out. I had a dead bead on him and began to tighten up on my trigger. He stopped and I saw he didn't have a thing in his hand. When he scrambled in at the door he failed to pick up his father's gun. I was sorry for him. I didn't want to kill him. I thought I was killed myself and didn't want to shoot.'

" 'If you had shot, would you have expected to kill him?' asked Colonel Houston.

" 'Oh, yes, I am positive I would have killed him.'

" 'What did you say to him?'

" 'I don't think I said anything. I didn't have time to say anything.

" 'He stopped when he saw that I had the drop on him. He stopped on the step two or three seconds. I could have shot. I had a lot of time to shoot if I wanted to. He backed up and went on back. Two or three fellows grabbed him and I walked into Abelman's store where I could watch both doors and sat down.'

" 'Did you see Officer Bailey when you went in there?'

" 'I didn't see him until Dave backed up. I didn't see Bailey until he came into Abelman's store. He followed me in there and asked me for my gun.'

## "Eyewitnesses Corroborate Defendant.

"The testimony given by the defendant was corroborated by other witnesses, including Charles W. Abbott, Willis G. Blanton, John M. Brooks and W. H. Mattison. Abbott and Mattison were eyewitnesses to the shooting.

"An interesting phase of the hearing involved the earlier proceedings in justice court. Owing to the weakened condition of the defendant, suffering from wounds received in the encounter, no testimony was offered at a preliminary hearing, under the law a justice of the peace not being authorized to discharge defendants in such cases. Accordingly an agreed bond of $5,000 was granted and furnished and the writ of habeas corpus sought. The point was then made the defendant not being in actual custody, was not entitled to the writ. Accordingly his attorney had him surrendered by bondsmen, there-

by perfecting the application for writ of habeas corpus."

On the question of damages, the following evidence was introduced:

Mr. Quinn himself testified:

"I don't know that I can tell of any one that thinks any less of me on account of the article, which was printed in the Chronicle, and which was sent to them by the two O'Fiel boys; that would be nearly impossible to say. I have testified by deposition in this case also. I testified that so far as I know I stood just as well in Beaumont since this article was published as I did before; that is, so far as I know; couldn't say anything has occurred to show me different. There has nothing occurred in Beaumont to lead me to believe that my position is any different now than it was before."

Col. Houston, counsel for appellee in habeas corpus proceedings growing out of the killing of John J. O'Fiel, testified in the trial of this cause as follows:

"I have not testified that Mr. Quinn was wronged by that article in the Chronicle. I stated the article was libelous, but I did not say that I thought he had been injured. * * * I could not say that I am acquainted with the sentiment in Beaumont relative to the killing. It would be my opinion, I could state my own opinion, but wouldn't like to state for anybody else. I am not in Beaumont constantly. I have talked with a number of people in Beaumont about it, and they have talked to me, and all the sentiment I have ever met with is in favor of Mr. Quinn—that he was justified. His friends and Judge O'Fiel's friends both lament it, but they didn't hesitate—like myself. I was a good friend of Judge O'Fiel, but when it came to expressing an opinion it was in behalf of Mr. Quinn. * * * As I said a while ago I couldn't say what the sentiment is in Beaumont as to Mr. Quinn, but those I have talked to all acquit Mr. Quinn. I can't recall of one that ever blamed him. But as to the people that lived elsewhere in East Texas, and at other parts, I couldn't say what they thought about it."

Mr. J. H. Hutchinson testified as follows:

"I live in Beaumont, and have lived there for about five years. I know the plaintiff in this case only by sight. I am familiar with the transactions that occurred in Beaumont last August, in which Mr. O'Fiel lost his life. Since that time I have had occasion to hear citizens of Beaumont express themselves with reference to the feeling or sentiment towards Mr. Quinn as to his connection with that. Have heard it several times, and the general impression is that he was justified in killing Mr. O'Fiel."

Mr. Mike Welker testified as follows:

"I live in Beaumont and have lived there for about 26 years. I am acquainted with the plaintiff in this case, and I am acquainted with the transaction in which Mr. O'Fiel lost his life. I have talked with various citizens in Beaumont the facts of the killing, and have heard them express themselves in reference to Quinn's connection with it, and he has been generally exonerated. I haven't heard anybody condemn him for it. That is the sentiment there. I have no connection with either party to this suit."

Dr. A. A. Bailey testified as follows:

"I live in Beaumont and have lived there for about ——— years. I am acquainted with the plaintiff in this case, and am acquainted with the transaction in which O'Fiel lost his life. I have talked with various citizens in Beaumont the facts of the killing and have heard them express themselves with reference to Quinn's connection

with it, and he has been generally exonerated, and I haven't heard anybody condemn him for it. That is the sentiment there. I have no connection with either party to the suit. * * * Outside of the immediate vicinity where Mr. Quinn lives, I don't know anything about what the sentiment is."

There is no evidence of any kind in the record which was introduced to show that Mr. Quinn suffered any damage to his reputation or business in Beaumont, outside of the immediate vicinity of Beaumont, or elsewhere by reason of the libelous article. All of the witnesses, without exception, including Mr. Quinn himself, specifically testified that Quinn suffered no damages to his reputation in Beaumont or elsewhere to their knowledge. The Chronicle gave prompt retraction to the statements made in the libelous article, and printed the same in the Sunday edition, and the retraction had the same place and prominence as did the libelous article. Yet, notwithstanding these facts, the jury awarded a verdict of $5,000 against the defendant, $4,000 actual damages and $1,000 exemplary. It further appears from the record that the appellee, Quinn, while on the witness stand, was permitted to testify that he was shot through the lungs and shoulder, and suffered much pain and agony and to further disclose his injury and confinement in the hospital.

I agree with the majority opinion of the court in the ruling made on the assignment of error based on the admissibility of this evidence, but still I am firmly convinced that this evidence so played upon the passion, prejudice, and sentiment of the jury that it must have been an actuating factor in the determination of the amount of the verdict. Certainly, the personal injury sustained by plaintiff in the encounter with the decedent O'Fiel, and the consequent suffering and confinement in the hospital, cannot legally be considered as a factor in arriving at the damages sustained by the plaintiff by reason of the printing of the libelous article.

The law, as I understand it, presumes some damages when an article is libelous per se, as in this case; but this presumption does not overshadow the further salutary rule that the damages awarded must be proportionate and in consonance with the injury suffered. While the law presumes damages in such a case, still, if no substantial damages have been suffered, then only nominal damages should be awarded under such presumption. It is permissible in such cases to inquire into the extent of the injury suffered and to negative any substantial injury. The mere fact that damages will be presumed will not justify an award not based on a theory of just compensation.

The record in this case clearly shows that there was no intentional wrong in the publication of the article upon which this suit is based, but through an unfortunate mistake or oversight the article found its way into the paper. For the reasons hereinabove

stated, I am of the opinion that the verdict for actual damages is excessive, and, instead of being $4,000 for actual damages, that such verdict should be reduced to $1,000 actual damages, and $1,000 exemplary damages, making a total of $2,000, and the appellee required to file a remittitur for $3,000; and, unless he does so, the case should be reversed and remanded for another trial.