LIGHT PUB. CO. v. HUNTRESS.
(No. 5944.)

(Court of Civil Appeals of Texas. San Antonio.
Jan. 2, 1918.)

1. LIBEL AND SLANDER ☞38(1) — NEWSPAPERS—"ABSOLUTE PRIVILEGE."

Rev. St. 1911, art. 5597, providing that certain publications of newspapers shall be deemed privileged and cannot be made the basis of action without proof of malice, does not give newspapers an "absolute privilege," because "absolute privilege" is based upon the theory that the publication of defamatory matter must be protected in the interest of and for the necessities of society, even though it be both false and malicious.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Absolutely Privileged; Second Series, Absolute Privilege; Absolutely Privileged Communication.]

2. LIBEL AND SLANDER ☞101(1)—NEWSPAPERS — COURT PROCEEDINGS — BURDEN OF PROOF.

Under Rev. St. 1911, art. 5597, providing that newspapers can publish accounts of court proceedings, etc., the burden is on one suing for libel to show falsity and unfairness, or that a publication was actuated by malice, because the statute protects the publications therein designated with a presumption of fairness and truthfulness.

3. LIBEL AND SLANDER ☞71 — STATUTES — DEFENSES—NEWSPAPERS.

Rev. St. 1911, arts. 5595–5597, relating to libel, did not destroy any common-law defense to libel, but rather added to the same so far as newspapers and periodicals are concerned.

4. LIBEL AND SLANDER ☞105(1)—PUBLICATION OF COURT PROCEEDINGS — SCOPE OF EXAMINATIONS.

In an action against a newspaper for libel in which the truth and fairness of an account of proceedings in court was not assailed, but only the fairness of comment and criticism thereon, it was proper to inquire into the circumstances surrounding plaintiff and the occasion that called for the comment as well as caused the publication of the court proceedings.

5. LIBEL AND SLANDER ☞48(3)—CANDIDATE FOR OFFICE — PUBLICATIONS CONCERNING FITNESS.

A newspaper has the right to publish, in good faith and within reasonable limits, the fitness and qualifications of any candidate for a public office.

6. APPEAL AND ERROR ☞1067 — CANDIDATE FOR OFFICE — PUBLIC CONCERN — INSTRUCTIONS.

Where a candidate for public office sued a newspaper for unreasonable comment on a certain court proceeding concerning his qualifications for office, it was prejudicial error not to instruct that such comment was about matters of public concern.

7. LIBEL AND SLANDER ☞48(3)—TRUTHFUL REPORT OF COURT PROCEEDINGS — UNFAIR COMMENT.

Although a report of a court proceeding was true, a newspaper did not have the right to base unreasonable and unfair comment and criticism thereon, although the subject of criticism was a candidate for public office.

Appeal from District Court, Bexar County; John T. Sluder, Judge.

Action for libel by George W. Huntress against the Light Publishing Company. Judgment for plaintiff, and defendant appeals. Reversed.

Templeton, Brooks, Napier & Ogden, of San Antonio, for appellant. Marshall Eskridge, Ward & Bickett, and J. F. Carl, all of San Antonio, for appellee.

FLY, C. J. This is an action for damages arising from an alleged libel instituted by appellee against appellant. It was alleged that appellee is an attorney at law practicing his profession in San Antonio, Tex.; that in 1912 appellee was a candidate before the primaries held by the Democratic party for the office of county judge of Bexar county, James R. Davis being his opponent; that appellee was defeated for the nomination in the primary, and during the campaign appellant, through its newspaper, the San Antonio Light, opposed appellee, and published and printed divers and sundry false and libelous statements of and concerning appellee in order to defeat him; that in 1916 appellee was a candidate before the said primaries for nomination to the office of county judge of the county court for civil cases in Bexar county against John H. Clark, and said newspaper advocated the nomination of said Clark, and the latter defeated appellee for said nomination, and said newspaper, just prior to the primary election, published of and concerning appellee "many slanderous, false, libelous, and defamatory articles," and referred its readers to the libelous and slanderous statements which had appeared in said newspaper in the campaign of 1912. It was further alleged that in 1911 there was pending in the county court of Bexar county, sitting in probate matters, an administration of the estate of F. Kruse, deceased; that on August 10, 1911, Albert G. Riedner was appointed temporary administrator, appellee being his attorney; that said Riedner continued as temporary administrator until November 6, 1911, when he was appointed and qualified as permanent administrator of said estate; that appellee performed a large amount of work for said administrator, and presented to him a claim of $1,000 for his services, which was allowed by said administrator, and, after a full hearing, was approved by the county judge sitting in probate, and the amount was paid to appellee by the administrator. It was further alleged that in its issue of July 23, 1912, said

newspaper published that appellee had charged a fee of $1,000 against an estate valued at $4,070.18; the estate was in money, which was in banks; that the administrator received only $100; that in his campaign appellee was promising to handle estates of poor at small expense; that the charge for the attorney's fee was made after appellee had announced as a candidate for county judge and had proclaimed his platform, "which embraced in part a declaration that widows and orphans, if he were elected, would have their interests conserved in the probate court"; that in the oath as to value of the estate it was given as $500, and the inventory was published showing the value of the estate to be $4,070.18; that the claims proved against the estate amounted to $43.50; that the temporary administrator collected the estate and preserved it, and he was allowed $100. The publication emphasized and restated the different points as to the attorney's fee, setting out a contract by and between the administrator and appellee for one-third of the money of the estate collected. It was further alleged that on July 16, 1916, the story as to the fee was repeated with embellishment, and also charging that appellee was the candidate of a "machine" which was trying to "ditch" Judge John H. Clark. It was alleged:

That the publication of the matters and things alleged tended "to expose plaintiff to public hatred, contempt, and ridicule and financial injury, and each and all of the same did tend to impeach plaintiff's honesty, integrity, virtue, and reputation, both as a man and as a lawyer and as a candidate before the people of said county for election to the office of judge of the county court of Bexar county for civil cases, and the same did cause him great mental pain and anguish, humiliation, mortification, and suffering, to his damage in the full sum of $50,000."

Appellant filed a general demurrer and 14 special exceptions, and answered by general denial, and that appellee was a candidate, and his acts were subject to a fair and candid criticism, and that was all that had been published by appellant. The publication of 1912 was withdrawn from the jury. The cause was tried by jury, being submitted on special issues as follows, with the answers of the jury:

"Question No. 1. Was the publication by defendant of July 16, 1916, and complained of in plaintiff's petition, libelous, as that term has been hereinabove defined? Answer 'Yes' or 'No.'

"We, the jury, answer the foregoing question: Yes.

"Question No. 2. Was the publication by defendant of the records of the probate court, and in evidence before you, a matter of public concern and published for general information? Answer 'Yes' or 'No.'

"We, the jury, answer question No. 2: No.

"Question No. 3. Was the comment and criticism of defendant of the acts of plaintiff reasonable and fair, under the circumstances under which said publication was made? Answer this question 'Yes' or 'No.'

"We, the jury, answer question No. 3: No.

"Question No. 4. Has the plaintiff sustained

199 S.W.—74

damages by reason of the publications contained in defendant's newspaper of July 16, 1916, and set forth in plaintiff's petition? Answer this question 'Yes' or 'No.'

"We, the jury, answer question No. 4: Yes.

"Question No. 5. If you have answered question No. 4 that plaintiff has been damaged by reason of publications complained of in his petition, then state what amount you find from the evidence before you he had been damaged, if any, and in arriving at such damages I charge you that you shall only award to plaintiff such actual damages as would ordinarily and probably result from the publication of the articles complained of, and in estimating his damages, if any, you may consider plaintiff's mental suffering, if any, and mental distress, if any, caused by such publication.

"We, the jury, answer question No. 5: Awarding plaintiff in damages the sum of fifteen thousand dollars ($15,000.00)."

The first four assignments of error assail the evidence as being insufficient to sustain a verdict, and contend that a verdict should have been instructed for appellant as requested by it. Appellee introduced in evidence a publication made by appellant in its newspaper on July 23, 1912, in which it was charged that appellee had charged as an attorney's fee the sum of $1,000 for services in connection with an estate of the value of $4,070.18; that he was making campaign promises to handle estates of poor people at little expense; that F. Kruse, deceased, was an aged German whose estate was worth the sum named, as shown by the records of the probate court; that the charge of $1,000, almost one-fourth of the estate, was made after appellee had announced his candidacy for the county judgeship and had proclaimed his platform, "which embraced in part a declaration that widows and orphans, if he were elected, would have their interests conserved in the probate court." It was further stated that the estate of Kruse, except four shares of stock of the value of $100, was in banks; that Albert G. Riedner, through appellee, had been appointed temporary administrator, and about two months after the death of Kruse, which occurred on July 27, 1911, application was made by appellee for the temporary letters to be made permanent; that in the application it was stated that administration was necessary because deceased "was indebted to various and sundry persons, and several persons and banks were indebted to him." It was further stated that on November 11, 1911, the administrator filed an inventory and appraisement of the estate, showing cash in San Antonio bank in the sum of $162.50, in Cuero bank of $818.05, in Bellville bank of $892.95, in bank at New Braunfels of $2,096.68, and in bank in New York City amount unknown, total $4,070.18; that only four claims were made against the estate, amounting in the aggregate to $43.50, which, deducted from the whole amount, left $4,026.86. This was followed by a verified report by Riedner and appellee that, had it

not been that the temporary administrator "had taken charge of all effects belonging to deceased, the same would have been burned or carried out as garbage, and none of the amounts of money which he had found could have been recovered for the estate," and "that it was on account of the investigation of your administrator that he discovered the money in the San Antonio National Bank and the various banks referred to." It was further stated that the temporary administration ended on November 6, 1911, and on that date Riedner was made permanent administrator, and five days afterwards the inventory was filed; that Riedner was paid $100 for his services, as shown by an order of the court, and that appellee put in a claim as follows:

"To legal services rendered to the administrator at his request, for the benefit of the estate. The said Huntress would show that through his untiring efforts he has succeeded in collecting over $4,000 in cash for the estate, and which amount would have been wholly lost to the estate, and the same would not have been collected, but for the administrator and said Huntress."

The rest of the reasons for the claim made by appellee, a part of the paper from which the foregoing is quoted, was printed, in which it was stated that the administrator had contracted to give appellee one-third of all amounts collected, but that appellee only claimed $1,000, and, as he expected to make further collections, he would, at the proper time, present a claim for further services. It was further stated that after appellee had begun his campaign for county judge, namely, on January 6, 1912, his claim for $1,000 was allowed, and that the records did not show whether appellee had collected "further claims due the estate" or that he had presented "his further claim for such services," but the administration had not been closed. There was then a summing up of the matters taken from the records of the probate court, as herein indicated, and the assertion by appellee in his campaign speeches that:

"If I am elected county judge, the estates belonging to widows and orphans shall be conserved and handled to their advantage."

Appellee, after the foregoing, introduced in evidence a publication in appellant's newspaper of date July 16, 1916, as follows:

" 'Machine' Aid for Huntress Brings Fight.

"Clark's Friends Using Campaign Material of Four Years Ago Against Him.

"Revive Story in Light.

"Tells of Fee of $1,000 Demanded by Huntress for Settling German's Estate.

"The attempt of certain 'machine' leaders to 'ditch' John H. Clark, county judge for civil cases, and throw his controllable vote to Judge George W. Huntress, is bitterly resented by Judge Clark's friends and bids fair to prove one of the factors in the ultimate wrecking of the Bexar county political 'machine.'

"The sacrifice of Judge Clark is said to have been decided upon to satisfy and make a place for Huntress, who was mentioned as a probable candidate against County Judge James R. Davis. It is a significant fact that some of Judge Davis' closest political followers are urging the selection of Huntress. It appears, however, that the 'machine' is not a unit for him, since some of the other county officers, candidates for renomination, are vigorously canvassing the county for Judge Clark.

"Fought Him Four Years Ago.

"This is another instance to prove the old adage that 'politics makes strange bedfellows.' Four years ago Judge Huntress voluntarily retired from the position to which he now aspires to make the race for county judge, being pitted against Judge James R. Davis. That campaign was a rather bitter one and the storm center was the race for county judge.

"The strongest political document used by the supporters of Judge Davis at that time came from the records of the probate court, being case No. 6020. This dealt with a fee of $1,000 demanded by and paid to Judge Huntress acting as attorney for the administrator of the estate of F. Kruse, an aged German. The total amount of the estate was $4,070, and all of it except four shares of stock, valued at $100, represented by money in the bank. Yet the attorney, Judge George W. Huntress, demanded and received ten times as much for his services as the administrator.

"Story Never Answered.

"The story of this affair as shown by the records and as printed in the Light of July 23, 1912, was never answered by Judge Huntress or his friends, and the facts there revealed were credited with being one of the factors resulting in his defeat by Judge Davis by a vote of 6,384 to 5,120, and the defeat of the old Callaghan 'machine.' Judge Clark's friends are using these facts with telling effect in this campaign."

This was followed by a republication of the charges made in 1912. Appellee also introduced in evidence an editorial from the San Antonio Light of July 16, 1916, as follows:

"The Same Man.

"The city and county machines, which have shown in the past that they care nothing for the rights of the public, or for the good of the people, are supporting a candidate for the position now held by Judge Clark. This candidate was repudiated by the voters of Bexar county when he ran against the present county judge, James R. Davis.

"The candidate is the brother of one of the managers of the San Antonio Express, which dares not publish one word against prohibition. That alone should be sufficient reason for the voters of San Antonio to vote against him at the polls. In addition to this reason, however, there were certain facts brought out by the Light against George Huntress, when he ran against Judge Davis, in connection with the administration of the estate of a deceased German citizen. These facts, which Huntress never could deny, were largely responsible for his defeat. They are as true of him to-day as they were then. They show his unfitness for office as clearly to-day as when he ran against Judge Davis.

"At that time the men who are now directing the Citizens' League were strong in their denunciation of George Huntress. They thronged into the office of the Light asking that it publish the facts it had collected against Huntress in connection with the administration of this estate. They were free in asserting, then, that these things conclusively proved him an utterly unfit person to occupy any position on the bench. Now they are seeking to convince the people

of San Antonio that this man has all the merit they formerly denied him.

"George Huntress has undergone no change since he last ran for office under the auspices of the morning newspaper, that does not dare to say that it is against prohibition. It is the leaders of the Citizens' League who have changed. With them it is now, as it has ever been since the first election of Mayor Brown, anything on earth that will permit them to retain their grip on the offices of San Antonio and Bexar county.

"Huntress has been repudiated once, and the indorsement of the city machine is good reason why he should be defeated again."

On the morning of July 26, 1912, appellee made a statement through the Daily Express showing that the most of the labor connected with administering the estate of Kruse was done by appellee, and that he had recovered a total of $5,400 for the estate, and had charged a fee of $1,000 and there was also a statement that after Riedner was appointed temporary administrator appellee "took matters in hand, and with great labor traced the different funds of this estate throughout the state of Texas and the United States, wrote numerous letters to Europe and to different sections of this country," and that he was still attending to matters of importance in connection with the estate. There was no denial of the facts taken from the records and published in the Light.

Appellee was examined as to the statements in the article of July 23, 1912, as to the $1,000 fee, as to the same being nearly one-fourth of the estate, that the money was in the banks, that the administrator received only $100 for his services, that appellee was the attorney, that appellee had promised "to handle estates of poor at little expense," and all the other statements of facts in the article were pronounced correct when they were published, and he also admitted that he got an additional fee of $442 for attending to the collection of the additional $1,800 after he had received the $1,000 fee.

In article 5595, Rev. Stats. 1911, "libel" is thus defined:

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings, tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury."

This definition is broad enough to include any case of libel that could arise, and the definition was intended by the lawmakers who enacted the law of 1901 (Acts 27th Leg. c. 26) to take the place of all other definitions of "libel." In the second section of the law, being article 5596, Rev. Stats., it is provided how damages may be mitigated, and, further, that:

"The truth of the statement or statements in such publication shall be a defense to such action."

In article 5597 it is provided:

"The publication of the following matters by any newspaper or periodical as defined in article 5595, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice: 1. A fair, * * * and impartial account of the proceedings in a court of justice, unless the court prohibits the publication of the same, when in the judgment of the court the ends of justice demand that the same should not be published, and the court so orders; or any other official proceedings authorized by law in the administration of the law.

"2. A fair, true and impartial account of all executive and legislative proceedings that are made a matter of record, including reports of legislative committees, and of any debate in the Legislature and in its committees.

"3. A fair, true and impartial account of public meetings, organized and conducted for public purposes only.

"4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

[1] Under the facts in this case "a fair, true and impartial account of the proceedings" in the county court of Bexar county was published by appellant. It is admitted by appellee that the account of the proceedings was true, and there was no evidence tending to show that the account was not fair and impartial, and indeed this phase of the matter was not made an issue before the jury. The only issue submitted in connection with fairness and reasonableness was as to the comment or criticism indulged in as to the proceedings that were published. Under the terms of the statute no absolute privilege is granted to newspapers or periodicals; for, before enumerating matter that shall be privileged, the statute qualifies the authority to publish by granting the power to destroy the privilege by "proof of actual malice." Absolute privilege is based upon the theory that the publication of defamatory matter must be protected in the interest of and for the necessities of society, even though it be both false and malicious. Whenever a publication can be rendered libelous by proof of malice, it is not a publication protected by absolute privilege. The statute places all newspaper publications made on the subjects and in the manner therein provided in the class of qualified privilege.

[2] Publications made as set forth in the statute are protected with the presumption of fairness and truthfulness, and that they were made without malice and the burden rests upon the person aggrieved by such publication to show its falsity and unfairness or that the publisher was actuated by motives of actual ill will and malice. Privileged publications are different from all other publications of defamatory matter, in that malice is presumed in every unprivileged communication, and proof of malice is not required by the complaining party, while as to publications qualified by privilege malice must be proved. Such proof might, of course, be furnished by the terms of the publication itself.

The attention of the court has been called to an opinion of the majority of the Court of Civil Appeals of the Sixth District in which it is held that any publication in a newspaper or periodical may be shown to be actuated by malice, thus holding that no absolute privilege is conferred upon newspapers by the statute. Associate Justice Hodges dissented, however, seemingly on the ground that the publication was libelous per se, and proof of malice was not required. Belo v. Looney, 201 S. W. ——, not yet officially published. The case is before the Supreme Court on the dissent. That question is not before this court; for it is conceded by appellee that there was a question of fact to be determined by a jury as to whether the publication was libelous or not.

[3] The Legislature, in passing the law of 1901, evinced no intention or desire to destroy or impair any defenses, but rather to add to the same, so far as newspapers and periodicals were concerned, and also leave to them, as well as others, all defenses under the common law. In no uncertain terms it provided that:

"Nothing in this act shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any existing defense to a civil action for libel. * * *" Section 4.

No one will question the fact that common-law defenses were "existing defenses to an action for civil libel" at that time, and no such forced construction can be placed upon the plain language used as that it was intended to protect such defenses in pending cases or cases which arose before the enactment of the law. That is done in the last clause of the section, which provides that nothing in the act shall "affect any suits now pending, or that may hereafter be brought upon a cause of action arising prior to the taking effect of this act." The law means what it says that it shall not "take away any existing defense to a civil action for libel." The courts, since the passage of the law, have uniformly recognized the right of defendants in civil libel cases to interpose the defenses existing at common law. We have thoroughly discussed this question and further discussion is unnecessary. Koehler v. Dubose, 200 S. W. 238. To hold that no common-law defenses were left by the Statute of 1901 would be to rule that no one except the owners of newspapers and periodicals had any defense, except possibly the truth of the publication, against any libel suit that might be instituted. No such proposition has been or probably ever will be sustained by any court of the state.

[4] The conclusions are reasonably deducible from the statute that the publishers of newspapers and periodicals are given certain special defenses to actions for libel, and that in addition all the common-law defenses are accorded to them and all other parties. It follows, therefore, that in passing upon the reasonableness and fairness of the comment or criticism in regard to the acts of appellee as shown by the proceedings of the probate court the fairness, truth, and impartiality of the account of which are not assailed, it would be proper to inquire into and investigate the circumstances surrounding appellee and the occasion that called forth the comment as well as caused the publication of the court proceedings.

[5] The facts in this case show that appellee was a candidate for a county office, and that appellant opposed him and was endeavoring to defeat him, and it became pertinent, just, and proper for the jury to be instructed as to the rights of newspapers in the discussion of a candidate for public office. In the case of Commonwealth v. Clap, 4 Mass. 163, 3 Am. Dec. 212, the Supreme Judicial Court held, in a case where the plaintiff was suing for damages for a libel published about him while he was a candidate, that the truth of the publication could not alone be used in justification, but held further:

"And when any man shall consent to be a candidate for a public office conferred by the election of the people, he must be considered as putting his character in issue, so far as it may respect his fitness and qualifications for the office. And publications of the truth on this subject, with the honest intention of informing the people, are not a libel. For it would be unreasonable to conclude that the publication of truths, which it is the interest of the people to know, should be an offense against the law."

Speaking on this subject, Mr. Newell says:

"Freedom of the press and freedom of speech are equally sacred and equally protected by the Constitution. Section 3 of the Bill of Rights provided that the liberty of the press shall forever remain inviolate; and all persons may freely speak, write, and publish their sentiments on all subjects, being responsible only for the abuse of the right. In the United States nearly all the officers are elective. The press possesses no immunities not shared by every individual in the land. In every election the same freedom in discussing the merits and demerits of candidates for office is allowed equally to the press and the people, and every citizen can claim to be interested in the election of his rulers." Newell, Slan. & Libel, § 634.

The statement as to the rule made by the text-book writer is approved in Express Printing Co. v. Copeland, 64 Tex. 354, in which case the facts were quite similar to those in this case, and the court held:

"Whatever pertains to the qualifications of the candidate for the office sought is a legitimate subject for discussion and comment, provided that such discussion and comment is not extended beyond the prescribed limits; that is, all statements and comments in this respect must be confined to the truth, or what in good faith and upon probable cause is believed to be true, and the matter must be pertinent to the issue, i. e., it must relate to the suitableness or unfitness of the candidate for the office."

Judge Cooley, in his great work on Torts, p. 442 (3d. Ed.), says:

"The freedom of the press was undoubtedly intended to be secured on public grounds, and the general purpose may be said to be to preclude those in authority from making use of the machinery of the law to prevent full discussion of political and other matters in which the public are concerned. With this end in

view, not only must freedom of discussion be permitted, but there must be exemption afterward from liability for any publication made in good faith, and in the belief in its truth, the making of which, if true, would be justified by the occasion. There should consequently be freedom in discussing, in good faith, the character, the habits, and mental and moral qualifications of any person presenting himself, or presented by his friends, as a candidate for a public office either to the electors or to. a board or officer having powers of appointment."

These are fundamental principles essential to the preservation of liberty in a democratic form of government. Publicity, truthful publicity, cannot be dispensed with in a government of the people, and any attempt to throttle such publicity and punish one who desires to faithfully present it to the public would be a thrust at the very heart and vitals of popular government. We cannot, therefore, conjecture that a Texas Legislature intended to destroy open, free, and full discussion of the character, fitness, and qualifications of any man who offers himself for the suffrages of the people. The rule given by the Massachusetts court, by Newell, by Cooley, and indorsed by the Supreme Court of Texas, as well as all great American courts, still exists, and the jury, in passing upon the fairness or reasonableness of the comment or criticism of a complaining party, should be permitted to take in consideration the fact that he was criticized while a candidate for office. The very fact that he was a candidate made a discussion of his fitness for the position he sought a matter of public concern published for general information. If anything in a democratic government can be of public concern, it undoubtedly is the character, fitness, and qualifications of a candidate for office. The jury should have been instructed that, appellee being a candidate for office, the publications as to his fitness for the office became a matter of public concern, and the only inquiry should have been as to the reasonableness and fairness of the comment or criticism arising from the publication of the privileged proceedings of the probate court as to the estate of F. Kruse, deceased.

Appellant requested the court to charge the jury that the proceedings of the probate court were matters of public concern, and that the comments and criticism were about a matter of public concern, and that the only issue was as to whether the comment was fair and reasonable.

[6] That charge should have been given; for the very fact that the court showed doubt as to the matter by submitting to the jury the question as to whether the publication was about a matter of public concern led them to consider that the question should be viewed as though appellee was criticized as a private citizen, and not as a candidate for office. How much a failure to give the requested charge, may have affected the ver-

dict as to the fairness and reasonableness of the comment cannot be ascertained, but it is a natural and reasonable conclusion that the jury, thinking that the publication was about a matter of no public concern, considered the matter as though appellee was not a candidate for office, and, so considering it, would inevitably arrive at a decision that the comment was unfair and unreasonable. The candidacy of appellee made comment on his fitness a matter of public concern, and upon that basis alone could the publication be justified. Consideration of that fact was denied to appellant. The only real issue for the jury to determine, in the absence of any attempt to show malice, was the fairness and reasonableness of the publication. If the proceedings of the county court were published with actual malice, the privilege of the publication might be destroyed, but no effort was made to show malice in any of the publications, and that issue was not presented to the jury.

[7] Although there may have been a truthful report of the proceedings of the county court, still, if the comment and criticism based thereon were not fair and reasonable, the truth of the matter on which they were based would not justify them, but such comment and criticism would be judged by their own fairness and reasonableness. The proceedings of the court cannot be made the excuse for venting malice and ill will toward a person, even though he be a candidate for office.

The other questions raised by appellant will not probably arise on another trial, and consequently need not be considered.

The judgment is reversed, and the cause remanded.