## EXPRESS PUB. CO. v. WILKINS.
### (No. 6317.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 21, 1920. Rehearing Denied Feb. 18, 1920.)

1. LIBEL AND SLANDER �köö82, 86(1)—"COLLOQUIUM" IDENTIFIES PERSON REFERRED TO; "INNUENDO" EXPLAINS MEANING OF WORDS BY REFERENCE TO ANTECEDENT MATTER.

In an action for libel, an "innuendo" in pleading is an explanation of defendant's meaning in the alleged libelous words by reference to some antecedent matter; its office being to aver the meaning of the language of the publication of which complaint is made, and the colloquium identifying the person to whom it was intended to be applied.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Colloquium; Innuendo.]

2. LIBEL AND SLANDER ⊃86(1)—WORDS MUST BE CAPABLE OF MEANING ASCRIBED BY INNUENDO, WHICH CANNOT INTRODUCE NEW MATTER.

Alleged libelous words must be capable of the meaning ascribed to them by the innuendo, the use of which can never change the import of the language used; moreover it cannot introduce new matter, or enlarge the natural meaning of the words, or give them a forced and unreasonable construction.

3. LIBEL AND SLANDER ⊃32—DEFAMATORY WORDS MAY BE ACTIONABLE PER SE OR BECAUSE OF SPECIAL DAMAGE.

Defamatory language may be actionable in itself or per se, or may be actionable only on allegation and proof of special damages or per quod.

4. LIBEL AND SLANDER ⊃33—DAMAGES PRESUMED FROM LANGUAGE ACTIONABLE PER SE, OTHERWISE MUST BE PROVED.

In the case of defamatory language actionable per se, damages in nonprivileged matters are conclusively presumed, but in actions per quod only any injury resulting from the use of the language must be alleged and proved.

5. LIBEL AND SLANDER ⊃7(1), 10(1)—ACCUSATION OF CRIME OR INCAPACITY OR MISCONDUCT OF OFFICIAL LIBELOUS PER SE.

Printed or written language falsely and maliciously charging crime is libelous per se, so that it is libelous per se to impute to an officer in his official character incapacity, fraud, dishonesty, misconduct, or want of integrity, or to charge that he has been induced to act in his official capacity by a pecuniary or other improper consideration, such as, if true, would be ground for his removal.

6. LIBEL AND SLANDER ⊃101(4)—PRIVILEGED PUBLICATION PRESUMED TRUE AND FREE FROM MALICE.

In case of a publication privileged under Rev. St. 1911, art. 5597, a section of the libel law, there is a presumption it was free from actual malice and made with fairness and truthfulness, and on plaintiff asserting otherwise is devolved the burden of showing the falsity and unfairness of the publication, and that the publisher was moved by malice or ill will toward him.

7. LIBEL AND SLANDER ⊃71—NEWSPAPER CAN INTERPOSE STATUTORY OR COMMON-LAW DEFENSES.

Any newspaper or periodical can interpose any defenses to a civil cause for libel that existed at common law or otherwise, in addition to the defenses enumerated in the libel law (Rev. St. 1911, art. 5595).

8. LIBEL AND SLANDER ⊃123(8)—PRIVILEGE QUESTION FOR COURT.

Whether an alleged defamatory publication is privileged or not is a question of law for the determination of the court, under the definition of privileged publications given in Rev. St. 1911, art. 5597, a section of the libel law.

9. LIBEL AND SLANDER ⊃123(2)—INFERENCE FROM NEWSPAPER PUBLICATION JURY QUESTION.

In an action for libel by the police judge of a city against a newspaper, whether a natural and legitimate inference could be drawn from the headlines of the publication that the chief of police and police judge were intended to be connected with a charge of corruption in relation to suppression of gambling and prostitution made by an army officer held for the jury.

10. LIBEL AND SLANDER ⊃19—LIBELOUS PART OF PUBLICATION AFFECTS THE WHOLE.

If any part of a newspaper publication was libelous of city officers, the whole was a libel; it all being one coherent article relative to charges against the city and officials in relation to the nonsuppression of gambling and prostitution, made by army officers.

---

⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

11. LIBEL AND SLANDER ⬅48(2)—PRIVILEGED ARTICLE BY NEWSPAPER RELATIVE TO SLACKNESS OR CORRUPTION OF CITY OFFICIALS.

Under Rev. St. 1911, art. 5597, rendering privileged reasonable and fair comment on acts of public officials, etc., a newspaper article relative to slackness and corruption on the part of the chief of police and police judge of a city, in failing to suppress gambling and prostitution at the instance of army officers, *held* privileged; proof of actual malice therefore being essential, and not inferable from the falsity of the charges alone.

12. LIBEL AND SLANDER ⬅104(1)—FALSITY OF PRIVILEGED COMMUNICATION EVIDENCE OF MALICE.

The falsity of a privileged publication is a circumstance which, taken with others, may show actual malice.

13. LIBEL AND SLANDER ⬅51(1)—"ACTUAL MALICE" NECESSARY TO RENDER PRIVILEGED PUBLICATION ACTIONABLE.

"Actual malice" is necessary to render a privileged publication actionable libel, implying a wrongful act done intentionally or with evil intent, without just cause or excuse or as the result of ill will.

14. LIBEL AND SLANDER ⬅124(6)—INSTRUCTION PREDICATING LIABILITY FOR PRIVILEGED PUBLICATION ON GROSS NEGLIGENCE ERRONEOUS.

In an action for libel by the police judge of a city against a newspaper on account of its article, privileged under Rev. St. 1911, art. 5597, charging that the judge and chief of police had been lax or corrupt in failing to suppress gambling and prostitution at the instance of army officers, an instruction in relation to the defense of privilege, which, instead of speaking of actual or express malice as a condition to defendant newspaper's liability, spoke of gross negligence, and predicated liability thereon, was erroneous.

Appeal from District Court, Bexar County; J. T. Sluder, Judge.

Suit by J. Ed. Wilkins against the Express Publishing Company. From judgment for plaintiff defendant appeals. Reversed and remanded.

Denman, Franklin & McGown and F. C. Davis, all of San Antonio, for appellant.

J. D. Dodson and Lewright & Douglas, all of San Antonio, for appellee.

FLY, C. J. This is a suit for damages based on allegations of the publication of libelous matter, instituted by appellee against appellant, which resulted, on a trial by jury, in a verdict and judgment for $15,000 actual and $6,000 punitory damages in favor of appellee.

The petition declared on three publications dated, respectively, December 23, 1917, December 28, 1917, and January 12, 1918. The only publication submitted to the jury was that of December 23, 1917, which is as follows:

"Two Local Officers Must Go, Verdict of Committee on Vice.

Action to be Recommended to Mayor in Extensive Report to be Filed During the Present Week.

Drastic Arraignment of Peace Officers Expected.

After Month of Diligent Investigation Committee Finds That Charges of Corruption Made by Army Officer are True—Threat of Martial Law if Conditions are Not Remedied.

"'The Chief of Police and the Police Judge of San Antonio must go.'

"This is the dictum of the citizens' committee of the business men appointed November 21 by Franz Groos, president of the Chamber of Commerce, to investigate vice conditions here. That action will be recommended to the Mayor in an extensive report to be filed this week by that committee, which consists of Edwin Chamberlain, chairman, Chester Terrell, secretary, and L. J. Hart, R. J. Boyle, and W. W. Collier.

"The substance of the committee's report is that every charge recently made against the public officials of this city and county on November 21, by George J. Anderson, Director of the Law Enforcement Division of the War Department Commission on Training Camp Activities, is true. Conditions in this city, the report will say, are shameful and should not be tolerated longer. And responsibility for those conditions is placed on the police department. Blame will be placed directly on the Chief of Police and it is probable that later on other officers of the law will be included in the accusations.

"Edwin Chamberlain, chairman of the citizens' committee, said last night that San Antonio should be prepared for a shock and a shakeup. 'For one month our committee has been working almost daily,' Mr. Chamberlain said, 'we have gone into every nook and cranny of the situation here. We have had before us as witnesses representatives of the Department of Justice, the United States Marshal, captains of the city police and the military police. We have the evidence and our report will consist of cold, hard facts which no body can refute and we have shown no favor in compiling our report. We will show no favor in making it.'

"Mr. Chamberlain was asked what he thought the Mayor would do about the report. His reply was: 'I cannot say as to that. I am inclined to think he will do his duty and clean up. I think the people of the city will demand that.'

"One of the moves seriously contemplated not only by army officers but by representative citizens, if matters complained of are not immediately rectified, is to ask the government to impose martial law on the city.

"The evidence taken by the city will show that gambling, prostitution, and bootlegging have thrived here which could have been prevented. Mr. Chamberlain said last night that gambling had been pretty well suppressed, it seemed. Some good work had been done toward suppressing the activities of immoral women. But bootlegging seems to be thriving still.

"The committee expects the War Department

to do just what is threatened to do if San Antonio was not cleaned up. The War Department threatened to remove the camps from around this city and permit no more to be established here. Already action has been taken in that direction. In a recent report made to the Surgeon General by Lieut. E. W. Miller it was recommended that work be stopped on Brooks Field, the new aviation school. Only intercession by business men who made favorable promises saved the field to the city. It was stated yesterday by high law enforcement officials representing the government that almost immediate action would be taken by the War Department if, in case of an unfavorable report by the citizens' committee, the report was not acted on.

"One section of the committee's report to Mr. Groos that is favorable to the city as regards law enforcement efforts since the mass meeting November 21, is the testimony of Col. George A. Skinner of the base hospital that diseases caused by vice have decreased almost 50 per cent. in the last month.

"Two or three more depositions are to be taken by the committee before the report is filed. All testimony will be given in detail, giving names, addresses, and citing actual instances of law violation.

"One of the most recent complaints of the military police in regard to the selling of liquor to soldiers is that two saloons, and one, especially, is such a large violator that guards have had to be placed in front of them to keep the bartenders from selling them liquors. An officer said yesterday that not only privates but officers had been taken out of one saloon in an intoxicated condition."

Through the first, second, third, and fourth assignments of error, which attack the sufficiency of the evidence, it is contended that the foregoing publication contained no charge of corruption made against appellee; the charges of the army officer referred to being in regard to the vice situation in San Antonio; that the undisputed evidence shows that the article was a reasonable and fair comment or criticism of the vice situation and a desire to obtain a correction thereof; that the article was published without actual malice and as a public duty; and that the facts contained in the article are true and the comments thereon reasonable and fair.

[1, 2] Most, if not all, of the innuendoes and the colloquium drawn from the publication refer to charges of corruption in office, and that a large portion, if not all, of the publication was directed at appellee as "police judge." An innuendo in pleading is an explanation of the defendant's meaning by reference to some antecedent matter. It is the office and function of the innuendo to aver the meaning of the language of the publication of which complaint is made; and colloquium identifies the person to whom it was intended to be applied. The words must be capable of the meaning ascribed to them by the innuendo, and the use of it can never change the import of the language used. The innuendo cannot introduce new matter or enlarge the natural meaning of words, or give them a forced and unreasonable construction. The entire office and purpose of innuendo is to allege the meaning of the language published. Newell, Slander & Libel, §§ 751-753; 17 Ruling Case Law, §§ 149-151, pp. 395-397.

[3-5] Language may be actionable in itself or as usually named per se, or may be actionable only on allegation and proof of special damages or per quod. The distinction is based on a rule of evidence; the difference between them being as to the proof required as to any resulting injury. In the case of language actionable per se damages in nonprivileged matters are conclusively presumed, but in actions per quod only any injury resulting from the use of the language must be alleged and proved. 17 R. C. L. § 4, p. 264. Printed or written language falsely and maliciously charging crime is libelous per se, and so it is libelous per se to impute to an officer in his official character incapacity, or any kind of fraud, dishonesty, misconduct, or want of integrity, or to charge that he has been induced to act in his official capacity by a pecuniary or other improper consideration, such as would be sufficient, if true, to cause removal from office. Cotulla v. Kerr, 74 Tex. 89, 11 S. W. 1058, 15 Am. St. Rep. 819; Bee Pub. Co. v. Shields, 68 Neb. 750, 94 N. W. 1029, 99 N. W. 823.

The statute (Rev. St. 1911, art. 5595) defines libel as follows:

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings, tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury."

As said by this court in Light Pub. Co. v. Huntress, 199 S. W. 1168:

"This definition is broad enough to include any case of libel that could arise, and the definition was intended by the lawmakers who enacted the law of 1901 (Acts 27th Leg. c. 26) to take the place of all other definitions of 'libel.'"

Whenever any definition given in text-book or statute conflicts therewith it must of course give way to the statute. It is also provided in article 5596 that—

"The truth of the statement or statements in such publication shall be a defense to such action."

In article 5597, however, of the libel law, four classes of cases are named in regard to which a publication shall be deemed privileged and shall not be made the basis of any action without proof of actual malice. The first includes proceedings in courts of justice or any other official proceedings authorized by

law; the second, executive or legislative proceedings made a matter of record; the third, "a fair, true and impartial account of public meetings, organized and conducted for public purposes only," and fourth, "a reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information." With the first three clauses we are not concerned in 'this case, for the publication was not about proceedings in a court of justice or any official proceedings in the administration of the law, nor as to legislative or executive proceedings, nor as to any public meeting organized and conducted for public purposes only; but the publication, if libelous otherwise, can be justified only on the ground that it was a reasonable comment on or criticism of the official acts of the appellee, or that it was a fair and reasonable comment on or criticism of a matter of public concern published for public information. The latter portion of that clause is very broad and expansive and opens up a fertile field for investigation. It will be noted, as suggested in the Light-Huntress Case, that no absolute privilege of publication is granted to newspapers and periodicals, but the privilege is qualified by the provision that it will be destroyed by "proof of actual malice." The publication of the matters named in the statute is permitted on grounds of public policy, for the purification and protection of the public service and as a safeguard against the corruption or inefficiency of public servants. The purity of society and the preservation of the rights of the citizens demand the widest and most thorough ventilation of the public acts of public officials, who are in theory, and should be in practice, the faithful servants of the people, and when publication of their acts is made with fair comment on or criticism of such acts, untainted by actual malice, the publication will be and should be given the full protection accorded by the statute.

[6, 7] Every publication made under the four clauses of the statute which gives them protection and immunity from attack makes them privileged publications, carries with it the presumption that they are free from actual malice and made with fairness and truthfulness, and on him who asserts otherwise is devolved the burden of showing the falsity and unfairness of any publication of which complaint is made, and that the publisher of the same was moved and actuated by malice and ill will towards the person complaining. Without "actual malice" back of and inducing a publication in regard to the matters named in the statute and herein pointed out, there is not nor can be any basis for damages. Any newspaper or periodical can interpose any defenses to a civil cause for libel as existed at common law or otherwise, in addition to the defenses enumerated in the statute. Article 5598, Rev.

Stats., as amended in 1917 (Acts 1917, c. 206, § 1 [Vernon's Ann. Civ. St. Supp. 1918, art. 5598]).

[8] Whether a publication is privileged or not is a question of law for the determination of the court, under the definition of privileged publications given in the statute. Cotulla v. Kerr, hereinbefore cited; Railway v. Floore, 42 S. W. 607; Cranfill v. Hayden, 22 Tex. Civ. App. 656, 55 S. W. 805; Dickson v. Lights, 170 S. W. 834. In this case, however, which is probably not to be condemned, the court submitted to the jury, not only the question as to the publication being grossly negligent, but also as to whether it was a privileged communication, or, in other words, whether it was reasonable and fair comment or criticism of a matter of public concern. There was also a submission as to whether the publication was a fair comment on or criticism of the official acts of appellee, and probably this was justified by the evidence, as the article in question did comment on and criticize the official acts of appellee, and was also devoted to giving a report as to an interview with a member of a committee which it seemed had been investigating conditions as to vice in the city of San Antonio, under the auspices of the Chamber of Commerce. The headlines purport to give a résumé or synopsis of the matter contained in the report. The first innuendo of any importance is as to the statement in the headlines that the committee had found "that charges of corruption made by army officer are true"; but there is no allegation as to what the charges were or at whom they were directed. The innuendo is that the publication falsely implied that appellee had been charged with corruption and that an investigation had found the charge true. The innuendo raised a question of fact for the jury, and it becomes necessary to investigate the reports made by an army officer.

The statement of facts discloses that Capt. George J. Anderson of the United States Sanitary Corps appeared before the Chamber of Commerce of the city of San Antonio and charged that the city authorities had failed "to keep their pledges to the War Department in the matter of the suppression of gambling, illegal sale of liquors, and also the suppression of prostitution." The officer stated that he did not know appellee and had never attended any trial in the corporation court. One charge made against appellee by the officer was that in which he stated that the bad conditions in San Antonio, he believed, were partly due to the leniency of his sentences of offenders in the corporation court. The uncontradicted evidence of appellee showed that he was very lenient in sentencing prostitutes and in suspending their sentences. Appellee swore that no charges of corruption were made against him, nor does it appear that such charge was made against any one;

the charge appearing to be a want of activity, and of leniency in enforcing the law. The evidence clearly showed that gambling, prostitution, and illegal traffic in intoxicating liquors was prevalent in San Antonio at the time the publication in question was made, and that the mayor had requested the infliction of more severe punishment by appellee in the corporation court. The committee of investigation made no charges of corruption against the appellee, but merely condemned the leniency of the fines imposed by him, and suggested that a successor be appointed with different views. The committee sustained the charge of corruption as to the city, but not as to the officers, and disclaimed any personal charges against the appellee in his capacity as judge of the corporation court. All the charge made against appellee as judge was leniency and not corruption.

[9, 10] No charge of corruption having been made by any army officer or any one else against appellee, the inquiry arises: Is it a reasonable and natural innuendo from the statement, "after a month of diligent investigation committee finds that charges of corruption made by army officer are true," that it was intended to charge appellee with corruption? The foregoing statement was preceded by the assertion that the verdict of the committee was that two local officers must go and that action as to them on the part of the mayor would be recommended and that there would be a drastic arraignment of peace officers, and the charge as to corruption being sustained was followed by the statement: "The chief of police and the police judge of San Antonio must go." The larger portion of the headlines was devoted to the contemplated action in regard to two officers whose identity was fully and clearly fixed by the comment on the synopsis of the intended report by a member of the committee. The question would then arise: Can a natural and legitimate inference be drawn from the headlines of the publication that the city officers were intended to be connected with the charge of corruption made by an army officer? We think it was sufficient to raise a question of fact to be determined by a jury. If there was no charge of corruption made by the army officer as against appellee, the jury might find in spite of that fact that the publication intended to charge that it did, and that would intensify the injustice of the charge, and might raise the question of actual malice. If any part of the publication was libelous, that would render the whole a libel. Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 609. We overrule the first four assignments of error.

[11, 12] The statute makes "a reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information" a privileged publication, and pro-vides that it "shall not be made the basis of any action for libel without proof of actual malice." Clearly, the publication forming the basis of this action is one of statutory privilege, and no damages could be recovered without proof of actual malice, which must be proved, and cannot be inferred from their falsity alone. Bradstreet v. Gill, 72 Tex. 121, 9 S. W. 753, 2 L. R. A. 405, 13 Am. St. Rep. 768; Laughlin v. Schnitzer, 106 S. W. 908. Of course the falsity of the publication might be a circumstance which, taken with other circumstances, might show actual malice.

[13, 14] The court submitted the issue to the jury, both negatively and affirmatively, as to the publication being a reasonable and fair comment and criticism of official acts or a matter of public concern, and in the third paragraph of the charge instructed the jury that if the publication was libelous and was a fair and reasonable comment or criticism of appellee's official acts, or on a matter of public concern, but that appellant was guilty of gross negligence in publishing it, then the verdict should be for appellee for such damages as he may have sustained. In the fourth paragraph gross negligence, as used by the court, was defined as:

"That the publication and circulation of said article by defendant was done in such manner and under such circumstances as to show a reckless disregard on the part of defendant towards the rights of plaintiff, and so wholly without care as to indicate an entire disregard of the consequences to plaintiff that might follow from the publication and circulation of said article."

The statute uses the words "actual malice," not "gross negligence," and yet the word "malice" is not mentioned in the charge, nor a definition of it attempted. Gross negligence is not necessarily malice, but it may under certain circumstances be an element of malice, just as any other circumstance might indicate it, such as strong political feeling or contempt. It would not be as strong an element as hatred or ill will, for either alone could form a sufficient basis for a charge of malice. In charging a jury as to matters defined by the statute it is best to use the words employed by the statute, and no word is more appropriate in an instruction as to what constitutes privileged matter than the language of the statute. "Gross negligence" is not used in the statute, and it is not proof of "gross negligence" that will render a publication, otherwise privileged, a basis for damages, but the statute provides that it must be proof of "actual malice." And in this connection it must be kept in mind that it is actual or express malice that must be proved, and not that which may be implied. It means a wrongful act, done intentionally or with evil intent, without just cause or excuse or as the result of

ill will. R. C. L. §§ 63, 64, and authorities in foot notes. It might possibly be that, if an actionable crime is charged against a person in connection with a privileged publication, proof of that fact might be proof of actual malice, which is malice in fact or express malice. We are disposed, however, to hold in this case that malice could not be inferred but must be proved. This seems to be the ruling in Belo v. Fuller, 84 Tex. 450, 19 S. W. 616; 31 Am. St. Rep. 75, where, after holding that the publication charged a crime, it was held:

"When the nature of the charge is actionable, as in this case, the law will assume, if the publication is unauthorized, that the plaintiff has been injured in his character and feelings; and evidence of damages in this respect is not required, as the law will presume that such loss resulted."

However that may be, in this case the law stamped the publication made by appellant as privileged, and no damages can be recovered without actual malice. It is true that in the case of Galveston Tribune v. Johnson, 141 S. W. 302, it was held that a publication cannot be privileged if untrue, but no such language can be found in the statute. It does not say that a publication shall be deemed privileged, and shall not be made the basis of any action for libel without proof of its falsity or actual malice. The ruling in the case cited was not necessary to a proper decision of the case, for it is stated that actual malice was proved. The falsity of a publication might be taken as a circumstance, along with others, to show actual malice, but that fact alone would not be sufficient. Speaking of privileged publications, it was said in Railway v. Richmond, 73 Tex. 568, 11 S. W. 555, 4 L. R. A. 280, 15 Am. St. Rep. 794:

"In such cases, although the statements made may have been untrue, malice cannot be implied from the fact of publication and to sustain an action in which the existence of evil motive must be proved."

See, also, Trimble v. Morrish, 152 Mich. 624, 116 N. W. 457, 16 L. R. A. (N. S.) 1017. The basis of damages in cases like this is proof of actual malice not the falsity of the statements and not gross negligence.

The very use of the word "negligence" would have a tendency to mislead any average jury, for most of them have well-defined ideas of negligence, and no definition of it, no matter how qualified by an adjective, would rid their minds of their preconceived ideas. We have seen no definition of actual malice that conforms to that given by the court, which introduced a word and a definition different from that given in the statute; and the jury was not informed that they should find for appellee if actual malice had caused appellant to make the publication, but that they so find if appellant "was guilty of gross negligence." That may have constituted an element to make up the constituents of malice under proper evidence, but it is not actual malice as used in the statute. Negligence might be evidence of malice but not malice itself, and could not take the place of the actual malice, proof of which is provided for in the statute.

Actual malice may appear from a general violation of the right consideration due to all mankind, which may not be personally directed against any one, but that would not be gross negligence. Malice is the gist or the main point on which an action of libel rests, and its meaning must not be obscured or changed so as to be calculated to mislead a jury. In the cases depended upon by appellee none of them were on publications made privileged by law, where actual malice must be proved and not inferred or presumed. The charge is justified by appellee on the ground that it was copied from the case of Chronicle v. Quinn, 184 S. W. 669, which did not come under the privileged communications named in the statute, and which was not used in connection with actual damages, but in regard to exemplary damages. Malice had been defined as to actual damages. Negligence cannot take the place of actual malice. The inference to be drawn from the proof of gross negligence cannot be substituted for proof of actual malice so as to destroy the immunity from damages given to a privileged publication. The charge was erroneous.

The court could not present the issue as to libel through a privileged publication without at least instructing the jury that such libel could not exist without proof of actual malice; and if that had been done there might be some merit in the contention that error as to the charge could not be sustained unless a definition of malice was requested. The trial court not only did not mention actual malice in the charge but instructed the jury as to gross negligence and told them to base their verdict on proof of that action by appellant. An objection was made to the charge on the ground that gross negligence would not constitute malice. Special charge No. 26 drew attention to the fact that the jury had not been instructed in accordance with the language of the statute, but it was refused and no change made in the court's charge. The special charge did not define actual malice, but it at least told the jury that the publication was privileged and without proof of actual malice the verdict should be for appellant. Actual malice was eliminated from the trial of the cause. There was no evidence of negligence, gross or otherwise, in the proceedings.

We have considered every question deemed of any importance in the briefs, and conclude that, for the reasons herein given, the judgment should be reversed and the cause remanded.